513 A.2d 930

**Evelyn KEE, Personal Representative of the Estate of Mark Schaffert, et al.,**

**v.**

**STATE HIGHWAY ADMINISTRATION, et al.**

**No. 559, Sept. Term, 1986.**

Court of Special Appeals of Maryland.

Sept. 4, 1986.

Certiorari Granted Nov. 10, 1986.

Paul Victor Jorgensen, Middletown, for appellants.

Nolan H. Rogers, Asst. Atty. Gen. and James K. Eagan, III, Sp. Counsel, Columbia, for appellees.

Argued before WEANT, ALPERT and BLOOM, JJ.

ALPERT, Judge.

No precept of the common law *was* more imperviously etched in stone than the notion "that the king himself can

do no wrong ..." [1]—the major premise of the doctrine of sovereign immunity. Although the doctrine is no longer sacrosanct, it continues to give rise to knotty legal problems, one with which we are confronted in the case at bar. Here, we must review the Maryland Tort Claims Act, which waives sovereign immunity in certain actions to the extent the State is covered by liability insurance, and determine whether the State waived its immunity when it failed to purchase sufficient insurance coverage as mandated by the legislature.

Before we discuss the doctrine and its place in Maryland law at the time of the occurrence which gave rise to the instant litigation, we pause to set forth the background of this case as gleaned from the agreed statement filed by the parties. *See* Maryland Rule 1029 b. Gary Schaffert and Evelyn Kee (appellants) filed a complaint in the Circuit Court for Frederick County on September 24, 1985, for damages arising out of an automobile accident which occurred on September 24, 1982, on a Maryland State highway. Appellant Schaffert alleged that he was injured as a result of the accident and that his brother, Mark Schaffert, died as a result of the accident.

The complaint alleged that the State Highway Administration of the State of Maryland (SHA or appellee) was negligent in failing to maintain properly a certain guardrail, that the SHA had actual notice of the defective, unsafe, and dangerous condition of the guardrail, the failure of which was the proximate cause of the accident.

Appellant Evelyn Kee, Mark Schaffert's mother and the Personal Representative of his estate, prayed for damages in the amount of $100,000 from the State of Maryland on behalf of the estate. Additionally, she prayed for damages in the amount of $100,000 from the State for Mark Schaffert's wrongful death and for the loss of consortium of her son, Gary Schaffert. Appellant Gary Schaffert prayed for

---

**1.** *Blackstone, Laws of England,* ch. 7 at 237.

damages in the amount of $100,000 for his injuries from the accident.

Following the denial of a motion to dismiss, the SHA moved for summary judgment, arguing that the State was immune because it did not have a program of insurance pursuant to Section 27 of Article 95 at the time of the accident. Appellants opposed the motion, asserting, *inter alia*, that the State's self-insurance program under the Maryland Tort Claims Act waived immunity. Apparently finding that the State did not waive its (sovereign) immunity, the trial court granted appellee's Motion for Summary Judgment.

## SOVEREIGN IMMUNITY—THEN AND NOW

The history of sovereign immunity (or governmental immunity) was thoroughly explored by Judge Barnes in *Godwin v. County Commissioners of St. Mary's County*, 256 Md. 326, 260 A.2d 295 (1970). The bases for the doctrine were explained by the court:

> It is well established ... that the doctrine was applied in the new States and was held to be applicable to the United States as one of the dual "sovereigns" in the federal system. The application of the doctrine in this country was most likely based more upon reasons of public policy than upon the concept of the new States or the United States being successors, as it were, of the former king. Indeed, it is clear in Maryland that public policy was a consideration for the application of this doctrine. In *State v. B. & O.R.R. Co.*, 34 Md. 344, 374 (1871), Bartol, C.J. [,] stated for the Court:
>
> > "This [sovereign] immunity belongs to the State by reason of her prerogative as a sovereign, *and on grounds of public policy.* Parties having claims or demands against her, must present them through another department of the Government—the Legislature—and cannot assert them by suit in the courts." (Emphasis supplied.)

When one considers the financial and other problems which might arise if the doctrine of sovereign immunity were not applicable, it was probably wise that our predecessors did apply it in Maryland. . . .

256 Md. at 333, 260 A.2d 295.

Unfortunately, a necessary side-effect of the doctrine of sovereign immunity was the individual citizen who, though injured by the government's wrongdoing, was barred from being compensated. The inequity of the doctrine was noted by Judge Cole in his dissenting opinion in *Austin v. Mayor and City Council of Baltimore,* 286 Md. 51, 83, 405 A.2d 255 (1979):

As the law now stands in Maryland, the injured citizen must bear all the harm thrust upon him by a negligent government. This is manifestly unjust and inequitable in light of contemporary concepts of cost spreading and the general rule that liability follows tortious conduct. Any additional expense due to tort claims should be treated as any other cost of administration and spread among the public.

The inequities of the doctrine notwithstanding, the Court of Appeals has steadfastly refused to abrogate sovereign immunity:

Quite apart from our prior decisions, it is desirable and in the public interest that any change in the doctrine of sovereign immunity should come from the legislative branch of the state Government rather than from the judicial branch inasmuch as there are fiscal considerations, administrative difficulties and other problems in balancing the rights of the State and its agencies with new possible rights of the individual citizens, which can far better be considered and resolved by the legislative branch than by the judiciary of the State.

*Jekofsky v. State Roads Commission,* 264 Md. 471 at 474, 287 A.2d 40. *See also Board of Trustees of Howard Community College v. John K. Ruff, Inc.,* 278 Md. 580, 584, 366 A.2d 360 (1976); Comment, *The State as a Party*

*Defendant: Abrogation of Sovereign Immunity in Tort in Maryland,* 36 Md.L.Rev. 653 (1977). Subsequent to this statement in *Jekofsky,* the Court of Appeals in *Board v. Ruff, supra,* said that when the General Assembly expressly authorizes suits to be brought against one of the State's agencies, it is the giving of a positive consent and "has the effect of waiving sovereign immunity as to that agency within its scope of duties and obligations." 278 Md. at 590, 366 A.2d 360. A legislative waiver, however, could not be unqualified.

Legislative authority for a governmental agency to be sued is not free from restrictions, even though limitations are not expressly made by the Legislature. Such authority does not impose unqualified liability even as to matters within the scope of the agency's duties and obligations. This Court has consistently held that suits may not be maintained unless money has been appropriated for the payment of such damages as may be awarded, or the agency itself is authorized to raise money for that purpose. We said in *University of Maryland v. Maas,* [173 Md. 554] at 558–559, 197 A. at 125:

"The decisions in this state go further than holding that without legislative sanction an arm of the state government ... may not be sued, and are to the effect that, even though there is a legislative authorization to sue, such suits may not be maintained unless funds are available or may be made available by the agency itself for the purpose of paying the claim for damages that may be established by the suit....

So it is established that neither in contract nor tort can a suit be maintained against a government agency, first, where specific legislative authority has not been given, second, even though such authority is given, if there are no funds available for the satisfaction of the judgment, or no power reposed in the agency for the raising of funds necessary to satisfy a recovery against it."

*Board v. Ruff,* 278 Md. at 590–91, 366 A.2d 360. Although *Ruff* concerned sovereign immunity in contract actions, we believe the three-part test it enumerates is equally applicable to tort actions:

[W]e must (1) decide if the [party defendant] is an agency of the State. If the [party defendant] is an agency of the State, the doctrine would be applicable (2) unless sovereign immunity had been waived by statute, expressly or by necessary inference therefrom. Even if sovereign immunity had been so waived, the doctrine would nevertheless be applicable (3) if no funds were available to the [defendant] for satisfaction of a judgment against it on the [tort] and no power was reposed in the [defendant] to raise such funds by taxation.

278 Md. at 586, 366 A.2d 360.

Contemporaneous with the court's opinion in *Ruff* was the publication of the "Report of the Governor's Commission to Study Sovereign Immunity" (November 1976). The report, which recognized the restrictions on waiver of sovereign immunity that were explicated in *University of Maryland v. Maas,* 173 Md. 554, 197 A. 123 (1938) (quoted in *Ruff,* 278 Md. at 590–91, 366 A.2d 360), focused in part on the fiscal consequences in the event sovereign immunity was waived in tort actions:

Generally, the Commission's survey of the State's agencies reveals that with the exception of the Department of Transportation (DOT), the State of Maryland's general tort claim experience has not been fiscally significant. Nine of the fourteen State agencies responding to the survey have not been the subject of a tort action. The tort experience of the remaining agencies has been negligible, both in the number of claims raised and in the fiscal consequences of those claims.

Administrative subdivisions of the Department of Transportation have been the targets of numerous tort suits. Insurance carriers for the MTA and MPA have absorbed over one million dollars in paid claims since 1972. The State Highway Administration has raised the

State's sovereign immunity shield to bar recovery in 179 claims instigated since 1972, amounting to in excess of five million dollars in claimant demands.

*Report* at 127–28.[2] The Report also summarized the comments, suggestions and observations of the various state agencies on the issue of abrogation:

Various alternatives to wholesale abandonment of sovereign immunity are discussed by the responding agencies. The Department of Economic and Community Development and the Department of Natural Resources suggest that the fiscal impact of a tort immunity waiver could be cushioned by limiting the waiver to insurable exposures. A few agencies agree with the State Highway Administration's acknowledgement of a system of administrative agency claims boards, empowered to consider and resolve disputes, as a reasonable alternative to complete abrogation of the doctrine.

The Department of Agriculture, the Department of Licensing and Regulation, and the Board of Trustees of the State Colleges explored the tort liability exposure of government agency employees. In general, these agencies are concerned that the doctrine's abrogation does not jeopardize the retention and performance of key government employees. It is recommended that certain government agency members be statutorily protected from tort liability in their individual capacities.

*Report* at 130.

Ultimately, the legislative branch responded to the call of its co-equal branches and enacted the Maryland Tort Claims Act. Laws of 1981, ch. 298. The preamble to Senate Bill 585 stated:

AN ACT concerning

State Immunity in Tort

---

2. The volume of claims experienced by the State Highway Administration is noteworthy in view of the facts of the instant case.

FOR the purpose of waiving the immunity of the State and its officials in certain tort actions to the extent that the State is insured; granting certain State personnel immunity from liability as individuals for such torts absent certain circumstances; providing for the representation of the State and its personnel in such cases; requiring the filing of a claim with the State Treasurer as a prerequisite to the waiver of such immunity; authorizing the Treasurer to consider, ascertain, adjust, determine, compromise, and settle such claims and contract for services; limiting the fees which attorneys may charge in such matters; directing the Treasurer to secure insurance for such purposes to the extent that funds are available; and generally relating to the immunity of the State and its personnel in tort.

Effective July 1, 1982, the Act, found in the Courts and Judicial Proceeding Article (1983 Cum.Supp.), provided in relevant part:

§ 5–403. *Waiver of State's immunity in tort.*

(a) *Actions in which State's immunity is waived.* —Except as provided in subsection (b) of this section, the immunity of the State from suit in the courts of this State and liability in tort is waived in the following actions *to the extent and in the amount that the State is covered by a program of insurance* established by the Treasurer pursuant to § 27 of Article 95.

.    .    .    .    .

(5) An action to recover damages caused by a defective, unsafe, or dangerous condition of any street, alley, sidewalk, or highway owned and controlled by the State if constructive or actual notice of the condition existed;

.    .    .    .    .

(b) *Purposes for which immunity not waived.*—The immunity of the State in tort is not waived for the following purposes:

(1) Punitive damages;

(2) Interest prior to judgment;

(3) Individual claims in excess of $100,000;

(4) An aggregate of claims arising from the same occurrence in excess of $500,000;

(Emphasis added). Subsection 5–403(a) must be read together with Md.Ann.Code Art. 95 § 27 (1979 Repl.Vol.) as amended by the addition of subsections (d) and (e) (1983 Cum.Supp.), for those amendments and the Tort Claims Act were enacted in the same legislation, *i.e.,* Laws of 1981, ch. 298. *See Baltimore Gas & Elec. Co. v. Dept. of Health and Mental Hygiene,* 284 Md. 216, 221, 395 A.2d 1174 (1979) ("all parts of a statute are to be read together to find the intention as to any one part"). The 1982 amendments to section 27 provide:

(d) To the extent that funds are available in the budget, the Treasurer shall provide self-insurance or purchased insurance or a combination of self-insurance and purchased insurance sufficient to cover the liability of the State and its employees under Subtitle 4 of Title 5 of the Courts Article of this Code.

(e) The limits of liability in subsection 5–403(b) of the Courts Article may not be construed to affect the authority of the Treasurer to provide insurance in any amount pursuant to the authority granted by this article.

Before proceeding, we note the general principles of statutory construction, most recently enunciated by the Court of Appeals in *Supervisor of Assessments v. Chase Associates,* 306 Md. 568, 510 A.2d 568 (1986):

In interpreting a legislative enactment, our function is to ascertain the legislative purpose underlying the enactment and to interpret its language in the manner that will most effectively accomplish this purpose.

*Id.* at 576, 510 A.2d 568 (citations omitted).

The intention of the legislature was made abundantly clear: "It is the intent of the General Assembly that this subtitle be interpreted broadly to assure that injured parties have a remedy." § 5–402(a), but to do so without adverse fiscal results. Thus, the Act can be interpreted as nothing

other than a clear manifestation of the legislature to waive the State's sovereign immunity in certain tort actions— namely those then listed in § 5–403(a)(1)–(6).[3] Cognizant of the Court of Appeals' statement in *Ruff,* the waiver is subject to restrictions which reflect the concern that liability to suit will deplete the State's coffers. These restrictions are (1) those enumerated in § 5–403(b) and (2) that immunity "is waived ... *to the extent and in the amount that the State is covered by a program of insurance* established by the Treasurer...." § 5–403(a) (emphasis added).

In simple language, therefore, the legislature, through enacting the Tort Claims Act, sought to provide a remedy to tort victims which would have otherwise been barred by the doctrine.

## FACTUAL PREDICATE FOR SUMMARY JUDGMENT

As we stated earlier, in moving for summary judgment, appellee argued that the State was immune because it did not have a program of insurance pursuant to Section 27 of Article 95 at the time of the accident, while appellants opposed the motion on the grounds that the State's self-insurance program under the Maryland Tort Claims Act waived immunity. These arguments, of course, focused not on whether the SHA was an agency of the State or whether the legislature had authorized an action for this type of tortious conduct, but on the third part of the test promulgated in *Board v. Ruff, supra:* whether funds were available for the satisfaction of the judgment.

The facts before the trial court on the Motion for Summary Judgments revealed the following. Jane Harrell, Insurance Manager for the State of Maryland, testified in her deposition that the legislature makes an appropriation to the State Treasurer's insurance program only once a year. Senate Bill 380 of the 1982 session ("The Budget Bill")

---

**3.** The tort actions to which waiver of sovereign immunity applies are now seven in number and are to be found in the Maryland Tort Claims Act, State Government Article § 12–104(a)(1)–(7).

provides for the following appropriation to the State Treasurer for fiscal year ending June 30, 1983:

STATE TREASURER

24.02.00.01 Treasury Management General Fund Appropriation ................................................. 1,550,025

24.02.00.02 Insurance Protection General Fund Appropriation, provided that not more than $1,000,000 of this appropriation shall be utilized to purchase commercial insurance for the purpose of a limited waiver of sovereign immunity for tort claims under the provisions of Section 5–403(a)(3)(4)[4] of the Courts and Judicial Proceedings Article (Maryland Tort Claims Act—Chapter 298 of Laws of 1981) and that no other portion of this appropriation may be expended for insurance under Section 27(d) of Article 95 ............. $2,836,500

24.02.00.03 Bond Sale Expenses General Fund Appropriation ...................................................... 278,250

SUMMARY

Total General Fund Appropriation ...................... 4,664,775

Laws of Maryland 1982, ch. 125 at 1383. Thus, it is clear that for fiscal year 1983 the Treasurer could not spend more than $2,836,500 on insurance coverage (either through purchased or self insurance) under Article 95, § 27(d).

The record shows that the appellants presented their claim to the State Treasurer under the Maryland Tort Claims Act on July 12, 1985. The State Treasurer's office referred the claim to Reliance Insurance Company, which carried the State's commercial insurance policy under the Maryland Tort Claims Act on the date of the accident.

---

4. Those sections related to actions to recover damages caused by "the patently dangerous condition of a building, structure, or other public improvement owned and controlled by the State" (§ 5–403(a)(3)); and the negligent use or maintenance of State property by a State employee (§ 5–403(a)(4)).

Reliance Insurance Company's policy with the State expressly excluded from coverage:

> An action to recover damages caused by defective, unsafe, or dangerous condition of any street, alley, sidewalk or highway owned and controlled by the State if constructive or actual notice of the condition existed. (This exclusion does not pertain to parking lots owned by or in possession of the State).

Upon receiving the claim, Reliance conducted its own investigation. Based on that investigation, it refused to cover the claim, providing the State with the following rationale:

> This loss arises out of a vehicle striking a guardrail while rounding a curve. The guardrail broke, penetrating the vehicle and causing the vehicle to flip off of the road and down the embankment.
>
> Our investigation reveals that on July 20, 1982, approximately two (2) months prior to this accident, this same guardrail was struck by another vehicle and damaged. The State inspected and drew up an estimate for repairs following this accident. The guardrail, however, was not replaced until January 12, 1983. It is apparent that the State had notice of the guardrail and its condition, and therefore, exclusion number 8 of Endorsement 5 is applicable.

Following Reliance's decision, the State Treasurer denied the claim in a letter sent to appellants' counsel. This letter stated:

> After a thorough investigation our insurer has determined that our insurance policy will not respond to this incident.
>
> In the absence of a program of insurance, the State would maintain its immunity, and I must, therefore, deny your claim against the State.

Subsequent to the Treasurer's denial, but prior to appellants' instant suit, the State instituted a self-insurance program "to afford protection to the State ... [i]n those

areas not covered by purchased insurance...." *See* Md. Admin.Code (COMAR) tit. 25.02.01 (1985).[5]

Based on the foregoing facts and arguments by the parties, the trial court granted the State's Motion for Summary Judgment.

## WAS SUMMARY JUDGMENT APPROPRIATE?

In reviewing the propriety of the trial court's action on a motion for summary judgment, the appellate court is concerned with whether there was a dispute as to any material fact, and if not, whether the moving party was entitled to judgment as a matter of law. *Brewer v. Mele*, 267 Md. 437, 298 A.2d 156 (1972); *Leonard v. Fantasy Imports, Inc.*, 66 Md.App. 404, 406, 504 A.2d 660 (1986); *see* Md.Rule 2–501. For the purposes of the motion, it was agreed that appellants' injuries were proximately caused by the SHA's failure to remedy an unsafe and dangerous condition of a state highway, of which the SHA had actual notice.

■ As we stated earlier, the legislature has clearly manifested its intention to waive immunity in this particular type of action, *see* Md.Cts. & Jud.Proc.Code Ann. § 5–403(a)(5) (1983 Cum.Supp.). Our interpretation of the Tort Claims Act, as discussed above, is that any intent to waive immuni-

---

5.  STATE INSURANCE PROGRAMS
    *Purchased and Self Insurance Programs*
    .01 *Limitations of Liability.*
    A.  Within budgetary appropriations and market availability, purchased insurance shall establish the limitations of State liability under the Maryland Tort Claims Act, State Government Article, §§ 2212–101—12–110, Annotated Code of Maryland.
    B.  In those areas not covered by purchased insurance, the Treasurer provides self insurance to afford protection to the State and its employees as defined in the Maryland Tort Claims Act, subject to the following limitations:
    (1) $50,000 to a single claimant for injuries;
    (2) $100,000 to be apportioned among multiple claimants for injuries arising from a single accident or occurrence; or
    (3) Those limitations otherwise established by any insurance policy issued to a State agency or other unit of State government by the Self Insurance Trust Fund.
    *See also* Md.State Gov't Code Ann. § 12–104 (1985 Supp.).

ty is subject to the fiscal capabilities of the State to pay in the event of an adverse judgment; in view of the legislative history that has been outlined above, we perceive no other logical interpretation.

Appellee's argument is simple. The plain language of section 5–403 states that immunity is waived in the instant action "to the extent and in the amount that the State is covered by a program of insurance...." Appellee then notes that "[a]t the time of the occurrence [of the accident] on September 24, 1982, the State Insurance Program did not have in effect insurance to protect the SHA from claims as described above...." Thus, it concludes, "Since there is no insurance covering this occurrence, the State has not waived its immunity."

Appellants, on the other hand, contend it is of no consequence that the commercial insurance did not cover the State's liability in this case. They rely on the more recent version of the Tort Claims Act which is found at § 12–104 to § 12–110 of the State Government Article (1985 Supp.). Section 12–104(c) provides in part that, "the Treasurer may pay from the State Insurance Trust Fund all or part of that portion of a tort claim which exceeds the coverage obtained under Article 95, § 27(d) of the Code...." Thus, appellants conclude, even though the insurance obtained by the Treasurer did not cover their tort claim, an adverse judgment can now be paid out of the State Insurance Trust Fund.

■ The changes afforded by the 1985 version of the Maryland Tort Claims Act, although significant and substantial, provide little solace for appellants' cause. In the preamble to that Act, the legislature stated its purpose of "providing that the waiver of the sovereign immunity of the State and its units is extended to include any claim of any amount *to the extent of insurance coverage....*" (emphasis added). Appellants assert that they are not asking that the Maryland Tort Claims Act be applied retroactively, but that since the State's self-insurance program was initiated more than a month before the Treasurer decided the claim,

and more than two months before the complaint was filed, there was coverage to pay for a claim under the Act. They further argue that it "makes no difference whether the coverage came into existence before or after the accident in question." We need not address those contentions simply because whether the 1982 Act applies or the 1985 Act applies, coverage remains subject "to the extent that funds are available in the State budget...." *See* State Finance & Procurement Article § 9–105(c) of the Annotated Code of Maryland. Section 12–104(c) merely provides that the Treasurer *may* pay from the newly created State Insurance Trust Fund in the event the claim *exceeds the coverage obtained* under Article 95, § 27(d). This provision actually has no relevance to the legal issues before us on appeal, for we are concerned not with the amount of recovery, but with whether there is to be any recovery at all. Even under the 1985 Act, appellants' recovery against the State is contingent upon insurance coverage obtained pursuant to Article 95, § 27(d). In a sense we have travelled a full circle. Whether we apply the 1985 or 1982 version of the Tort Claims Act, the question remains—whether the Treasurer could have provided appropriate coverage.

■ Shifting our attention once again, closer scrutiny of appellee's argument reveals it to be not so simple. Notwithstanding the undisputed fact that the State's insurance policy expressly excluded coverage in this case, it was also an undisputed fact that the Treasurer was required by statute to obtain sufficient insurance to cover any potential liability flowing from the State's waiver of immunity.

> To the extent that funds are available in the budget, the Treasurer *shall* provide ... insurance sufficient to cover the liability of the State under [the Tort Claims Act].

Md.Ann.Code Art. 95 § 27(d) (1983 Cum.Supp.).

It has been held that where a statute requires the performance of an official duty, an individual should not be made to suffer by reason of the official's dereliction, be-

cause the policy of the law is to guard against the failure of public service. *See State ex rel Smith v. Johnson,* 12 Ohio App.2d 87, 231 N.E.2d 81, 84, 231 N.E.2d 81 (1967); *accord Fulton v. City of Lockwood,* 269 S.W.2d 1, 8 (Mo.1954) (statute for benefit of public may not be thwarted by official's act of omission or commission). This rule had also been adopted by the federal courts, *see McComb v. Homeworker's Handicraft Cooperative,* 176 F.2d 633, 641 (4th Cir.), *cert. denied,* 338 U.S. 900, 70 S.Ct. 250, 94 L.Ed. 553 (1949); *Joanna Western Mills Co. v. United States,* 311 F.Supp. 1328, 1333–35 (Cust.Ct.1970). *See generally* 67 C.J.S. *Officers* §§ 2200–201 (1978). Any other rule would lead to an absurd result in this case: the Treasurer, by failing to heed an express directive by the legislature—to procure sufficient insurance coverage—could effectively reinstate the total immunity in situations where the legislature had clearly intended to waive it.

The next logical question, therefore, is why did the Treasurer not procure insurance sufficient to cover the instant action? The record indicates that for the 1982–83 fiscal year, the Treasurer had an allocation of $2,836,500 with which to purchase sufficient insurance protection. *See* Senate Bill 380 (1982), *supra.* The record does not indicate, however, what portion, if any, of this general insurance allocation was available to cover liability arising under Section 5–403(a)(5). Nor does the record indicate what the additional cost would have been to obtain the coverage found lacking in the instant case. Those omissions in the record are critical and should have precluded the trial court from entering summary judgment in behalf of either party.

Before the trial court could determine whether there was a waiver of the defense of sovereign immunity, it must necessarily determine whether coverage was available, either through purchased commercial insurance or through self-insurance or through a combination of the two. The legislature clearly manifested its intent to waive sovereign immunity in situations like the instant case, subject, of course, to the fiscal restraints of the budget. Therefore,

the Treasurer had a duty to provide the necessary coverages as set forth in the Act as amended from time to time. Of the six (later seven) different causes of action to which waiver of sovereign immunity obtained, the legislature expressed no preference for any single cause of action. Thus, the Treasurer could not provide for insurance coverage for one type of action to the detriment or exclusion of another. For example, if funds were available to provide a $50,000 policy for each cause of action, the Treasurer lacked the discretion to provide $100,000 for one cause of action if that increased coverage would preclude purchase of coverage for another of the enumerated causes.

■ The defense of sovereign immunity, although not enumerated as such under Md.Rule 2–323(g), we believe to be an affirmative defense whose very foundation in this case rests upon the availability of insurance coverage. As we explained earlier, the legislature clearly manifested its intent to waive immunity in this type of action if fiscally possible. The State Treasurer had the profound duty of carrying out the will of the legislature unless, because of budgetary limitations, he could not purchase the necessary insurance. Thus, the State had the burden[6] of going forward with evidence to establish that insurance coverage, either through the purchase of commercial insurance, self-insurance, or a combination of both, was not available within the appropriation made by the legislature. Rather than inquire further into these fiscal issues, however, the court seemed satisfied by the mere fact that the policy of insurance that was purchased excluded coverage in the appellants' case. This overly simplistic approach was legally incorrect and summary judgment should not have issued.

Whether the appropriate coverage could have been obtained and, if so, why the Treasurer did not obtain it, are facts that have yet to be revealed but hopefully may be determined on remand.

---

6.  *See Crowther v. Hirschmann,* 174 Md. 100, 109, 197 A. 868 (1938).

JUDGMENT VACATED; CASE REMANDED FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION; COSTS TO ABIDE THE RESULT.