552 A.2d 947

**Marjorie Elizabeth FOOR, Personal Representative of the Estate of Anthony Charles Foor, et al.**

v.

**JUVENILE SERVICES ADMINISTRATION, et al.**

**No. 684, Sept. Term, 1988.**

Court of Special Appeals of Maryland.

Feb. 3, 1989.

**152**

Mark Van Bavel (Michele M. Leipold, on the brief), Baltimore, for appellants.

Ellen A. Callegary, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen., Robert T. Fontaine, Asst. Atty. Gen. and Omar Melehy, Staff Atty., on the brief), Baltimore, for appellees, JSA, Holmes, Lochary, and Smoot.

Paul F. Newhouse (Amy Heinrich Tidey and Eccleston and Seidler, on the brief), Baltimore, for appellees, Psychology Consultants Associates, Clapperton, Helweg, Sachs, Wessel and Bartkovich.

Arnold Jablon, Co. Atty. (Thomas K. Farley, on the brief), Towson, for Baltimore County Police Dept. and Thirkield H. Guy.

Barry Bach, Allen F. Loucks (Smith, Somerville & Case, on the brief), Baltimore, for appellees, Bd. of Educ. of Baltimore County, Sydnor and Foulk.

Argued before WILNER, BLOOM and ROBERT M. BELL, JJ.

WILNER, Judge.

This case arises out of a tragedy—the murder of 15–year old Anthony Foor by Gregory Reiter, a foster child living in the Foor family home. In the early morning of February 20, 1983, Reiter, then 16, entered Anthony's bedroom and slit his throat with a hunting knife as he lay in bed. As Anthony's family rushed futilely to the aid of their dying child, Reiter adjourned to another part of the house where he attempted, unsuccessfully, to commit suicide by shooting himself in the face.

In an attempt to hold someone other than Reiter responsible for what occurred, Anthony's parents and his estate filed suit in the Circuit Court for Baltimore County against:

(1) The State Juvenile Services Administration (JSA) and three of its employees—Gary Holmes, Joseph Lochary, and Kenneth Smoot;

(2) The Baltimore County Board of Education and two of its employees—Nancy Foulk and James Sydnor;

(3) The Baltimore County Police Department and one of its employees—Thirkfield Guy; and

(4) Psychology Consultants Associates (PCA), the four partners of that entity, and one employee, Gail Bartkovich.

The thrust of the plaintiffs' complaint, which we shall describe in more detail shortly, was that, in agreeing to participate in the foster care program, the Foors had made clear to JSA that they did not want a child who had a history of drug abuse, that Reiter in fact had a history of both drug abuse and criminal behavior, that JSA knew of that history but placed the child in the Foor home nevertheless without informing the Foors of Reiter's history, and that Reiter was under the influence of drugs when he killed Anthony. The various defendants were charged with negligence and intentional infliction of emotional distress.

From the beginning, the plaintiffs seemed to have great difficulty in complying with elementary rules of pleading and setting forth a clear and precise statement of their case. The initial complaint was dismissed by Judge Hinkel because it failed to contain "separately numbered paragraphs and counts" as required by Md.Rule 2–303.[1] That, we might add, was not the only defect in the pleading; it was, in the vernacular, a mishmash. A first amended complaint, followed quickly by a second amended complaint, was then filed. They too attracted motions to dismiss or for summary judgment. Those motions came before Judge Fader who, on an initial review, was sufficiently perplexed as to require the plaintiffs to submit an outline of what the complaint was about. Even after receiving the outline, he noted that he had "never seen a pleading like this" and that "[i]t will have to be restated again in an amended complaint." The net result of that hearing was (1) a dismissal of the county police department and its employee from the case and (2) a direction to file a third amended complaint against the other defendants. Judge Fader's near-parting comment was, "This pleading has to be cleaned up."

The plaintiffs tried two more times, with a third amended complaint and a subsequent amendment by interlineation to that complaint. That last complaint, as amended, was also dismissed, this time without leave to amend. Once again, the court found "vague language" but concluded that, "[t]roublesome though the inartful pleading may be to a Judge trying to sort out pleading requirements and to defense attorneys who must plead specifically to the allegations made, it represents the best that the Plaintiffs have to offer. And it is not enough." The action was dismissed on the ground that the plaintiffs had failed to state a cause of

---

1. In his memorandum opinion, Judge Hinkel expressed the belief that the substantive allegations sufficed to state causes of action in negligence and intentional infliction of emotional distress. Because the complaint was, in fact, dismissed, however, Judge Hinkel's views as to the sufficiency of the allegations could not be regarded as a holding in the case but constituted mere *dicta*.

action, for either negligence or intentional infliction of emotional distress, against any of the remaining defendants.

In this appeal, the plaintiffs urge that Judge Fader erred in his conclusions.

Because some of the defendants stand in different positions, because the allegations against them are not uniform, and because some purport to enjoy defenses not available to others, we need to address them in separate groupings.

## I. JSA And Its Employees—Negligence Counts

JSA and its three employees (Holmes, Smoot, and Lochary) were sued in Counts 1, 2, 3, and 10 of the final complaint. Gail Bartkovich, who, as we shall see, was apparently an employee of PCA, was also sued in those counts as well as in the counts addressed to PCA (Counts 7, 8, and 9). Counts 1, 2, and 3 were based on negligence; Count 10 purported to charge intentional infliction of emotional distress; we shall consider that count later.

Count 1 was a "survival" action brought by Anthony's estate. *See* Md. Est. & Trusts Code Ann. § 7–401. In it, the estate charged that:

(1) The Foors had made clear to Holmes, a JSA "representative," that "the only condition they had for participation in the [foster care] program was that no child with a drug problem, past or present, should be placed in their home" and that Holmes, "the agent of JSA," agreed to that condition;

(2) In September, 1982, JSA caused Reiter to be placed in the Foor home;

(3) Reiter had a "specific history of substance abuse including the ingestion of PCP, amphetamines, LSD, cocaine, qualudes, as well as the daily use of marijuana" and had "further exhibited criminal behavior which required his appearance before the Juvenile Court";

(4) "JSA, and its employees and agents, were aware of REITER'S drug abuse problem";

(5) The Foors "had no expertise or ability to deal with or recognize persons ingesting controlled dangerous substances" and "were not told of Reiter's drug problem";

(6) Bartkovich, "a psychology consultant under contract with JSA," who knew or should have known of Reiter's substance abuse problem, "encouraged" the Foors to accept Reiter into their home;

(7) Smoot, an employee of JSA, "negligently obtained REITER'S release from the Maryland Training School for placement in foster care"; Lochary "was REITER'S counselor with JSA";

(8) As a result of the defendants' negligence, Reiter, while under the influence of "alcohol and/or controlled dangerous substances" killed Anthony on February 20, 1983;

(9) That negligence consisted of:

(i) Removing Reiter from a detention facility and placing him in the community when it was unsafe to do so;

(ii) Placing Reiter with the Foors in contravention of the condition they imposed;

(iii) Failing to warn the Foors that Reiter had a drug problem and that "the threat of a serious danger of violence to them may exist";

(iv) Failing to supervise and treat Reiter "in a meaningful manner," to "competently render services" to Reiter, and to render "proper medical and support services pursuant to a contract, with the FOORS as beneficiaries of the contract"; and

(10) JSA did not enjoy sovereign immunity in that

(i) Sovereign immunity was waived through the enactment of the Tort Claims Act, citing to Md. State Gov't Code Ann. § 12–104(a);

(ii) A claim had been made to and denied by the State Treasurer; and

(iii) "[A]ll Defendants heretofore mentioned were either healthcare or healthcare related employees of or agents of

or under contract with JSA, for healthcare services and were being paid in whole or in part by State funds."

In Counts 2 and 3, Anthony's parents were the plaintiffs. Count 2 was a "wrongful death" action (Md.Cts. & Jud. Proc.Code Ann. § 3–904); in Count 3, the parents sought recovery for their own injuries and damages flowing from Anthony's death. No new substantive allegations were made in those counts; the allegations of Count 1 were incorporated by reference.

### A. Sovereign Immunity—JSA

JSA, Holmes, Smoot, and Lochary moved to dismiss Counts 1, 2, and 3 of the complaint on the ground that those counts failed to state a cause of action. As noted, the Foors specifically alleged that any sovereign immunity possessed by JSA had been waived by the enactment of the Tort Claims Act, in particular Md. State Gov't Code Ann. § 12–104(a), and neither JSA nor its employees took issue with that averment. None of them raised the issue of sovereign or governmental immunity in the Circuit Court, and the court, though observing that the naming of State and local agencies "raises issues of governmental immunity," decided that, in light of the fact that it was dismissing the complaint on the merits, it need not address the immunity issues.

In this appeal, JSA and its employees have decided to press the issue of immunity. They urge that, as whatever cause of action the estate and the Foors may have arose, at the latest, in 1983, the question of immunity must be determined in accordance with the law then in effect. The law at that time, they point out, was codified in Md.Cts. & Jud.Proc.Code Ann. §§ 5–403 and 5–404. With minor amendments not relevant here, those sections were part of the initial Tort Claims Act enacted by the Legislature in 1981 (1981 Md.Laws, ch. 298).

Section 5–403(a) provided that, subject to certain limitations set forth in § 5–403(b),

"the immunity of the State from suit in the courts of this State and liability in tort is waived in the following actions to the extent and in the amount that the State is covered by a program of insurance established by the Treasurer pursuant to § 27 of Article 95."

There followed then six categories of actions to which the waiver applied, only one of which, the parties agree, could have any possible application to the case at bar. That was § 5–403(a)(2)—"[a]n action to recover damages caused by the negligence of a health care employee of a State facility or institution or by a doctor, nurse, dentist, or related health care personnel employed by the State." JSA insists that, despite the plaintiffs' averment that the JSA employees were "either healthcare or healthcare related employees," they in fact were *not* such employees and that § 5–403(a)(2) therefore doesn't apply. On that basis, JSA urges that it is immune from suit.

 The plaintiffs' singular response is that JSA is not entitled to raise a sovereign immunity defense for the first time on appeal. They do not otherwise contest JSA's position on this issue. Both sides are wrong. A State agency *may* raise this defense for the first time on appeal, although it is hardly fair, or even "good lawyering" to do so; as we shall see, however, it is not the 1981 law that governs in this case but the expanded waiver of immunity that came about in 1985.

The State's ability to raise this defense for the first time on appeal was made clear in *Board v. John K. Ruff, Inc.*, 278 Md. 580, 366 A.2d 360 (1976). At 583, 366 A.2d 360, the Court explained:

"It is of no moment that the matter of sovereign immunity was not raised below by the pleadings or otherwise. We made clear in *Bd. of Education v. Alcrymat Corp.*, 258 Md. 508, 516, 266 A.2d 349, 353 (1970) that '... the law is well established that counsel for the State or one of its agencies may not either by affirmative action or by failure to plead the defense, waive the defense of governmental immunity in the absence of express statu-

tory authorization, or by necessary implication from a statute....' We must consider whether the doctrine of sovereign immunity is applicable in this case even though it was not previously raised by the parties."

(Footnote omitted.)

The question then becomes, what immunity do JSA and its employees have?

■ As noted, JSA and its employees claim that the 1981 law governs, although they give no reasons and cite no authority for that proposition. It is true that, under any reading of the complaint, the causes of action attempted to be pled arose sometime in 1983. The initial complaint was filed in February, 1986, however; the third amended complaint was filed in April, 1987.

By 1985 Md.Laws, ch. 538, the Legislature greatly expanded the Tort Claims Act, and with it the waiver of sovereign immunity. In place of the six categories of actions for which immunity had been waived in 1981, the 1985 law, codified in Md. State Gov't Code Ann. § 12-104,[2] waived the immunity of the State and its units "as to a tort action, in a court of the State, to the extent of insurance coverages under Article 95, § 27(d) of the Code [since recodified as Title 9 of the State Finance and Procurement article]." The only limitations on that waiver, aside from the insurance coverage, were those stated in § 12-104(b), the only relevant one, as to JSA, being the retention of sovereign immunity against punitive damages.

There is a legitimate question of whether the 1981 law or the 1985 law applies to this action. As is not uncommon, one can find well-venerated rules of statutory construction that pull in opposite directions. *See Kaczorowski v. City of Baltimore*, 309 Md. 505, 512, 525 A.2d 628 (1987). On the one hand, statutes in derogation of the common law, and

---

**2.** The Tort Claims Act and other provisions dealing with sovereign and governmental immunity were transferred to the new State Government article in 1984 as part of the general code revision project. *See* 1984 Md. Laws, ch. 284.

especially those in derogation of sovereignty, are usually construed strictly. *See Bruce v. Dyer,* 309 Md. 421, 431-32, 524 A.2d 777 (1987); 3 Sutherland, Stat.Const. § 62.01 (4th ed.). On the other hand, the Tort Claims Act, and the waiver of immunity encompassed by it, is in the nature of remedial legislation that the General Assembly itself has declared should be "construed broadly, to ensure that injured parties have a remedy." Md. State Gov't.Code Ann. § 12-102.

The most cardinal of all the rules of construction, of course, is that which directs that we endeavor to ascertain and then follow the legislative intent. One indication of that intent is § 12-102, requiring a broad reading of the statute favorable to the claimant. There is another, even more specific, indication, entirely consistent with the approach stated in § 12-102—a comparison of the "effective date" provision of the 1985 Act with counterpart provisions in earlier waivers of sovereign immunity by the General Assembly.

The first broad waiver of sovereign immunity by the Legislature in modern times came about in 1976 when, by 1976 Md.Laws, ch. 450, the Legislature precluded the State and its agencies and political subdivisions from raising the defense in an action based on written contract.[3] In enacting that statute, the Legislature was well aware that it was breaking new ground (see the "Whereas" clauses included in the session law as a prelude to the statute itself), and it therefore carefully added a provision "[t]hat this Act shall not apply to any action based on a contract entered into or executed prior to the effective date of this Act." 1976 Md.Laws, ch. 450, § 6. It made crystal clear, in other words, that the waiver was to be entirely prospective and

---

**3.** As Judge Eldridge pointed out in *Austin v. City of Baltimore,* 286 Md. 51, 69, 405 A.2d 255 (1979) (Concurring and Dissenting Opinion), in 1786, the Legislature had specifically authorized suits to be filed against the State (1786 Md. Laws, ch. 53), but that authority was repealed in 1820 (1820 Md. Laws, ch. 210).

that the relevant event for that purpose was not the filing of the action but the contract itself.

A similar approach was taken with the initial enactment of the Tort Claims Act in 1981. Not only did the Legislature provide for a delayed effective date of the Act (the bill was passed in the 1981 session of the Legislature and was approved by the Governor in May, 1981, but did not take effect until July 1, 1982) but expressly provided that the Act "applies only to causes of action arising on or after July 1, 1982." 1981 Md.Laws, ch. 298, § 2. Indeed, the Legislature added that provision by amendment to the bill during the legislative process.

In sharp contrast to this approach followed in 1976 and 1981, when enacting the 1985 law, the Legislature omitted a provision of that type and simply stated that "this Act shall take effect July 1, 1985." 1985 Md.Laws, ch. 538, § 3. It would be difficult for us to conclude that this was the product of inadvertence. The bill was given careful and thorough consideration; it was requested by the State Treasurer, who played a major role in implementing the Tort Claims Act, *see Gardner v. State*, 77 Md.App. 237, 549 A.2d 1171 (1988), and was supported by the Attorney General, who is responsible for defending these claims; the proposal was considered by the House Judiciary Committee during the 1984 summer recess at the request of the Legislative Policy Committee and was reviewed and commented on by the Maryland Trial Lawyers' Association, Inc.

We assume that the Legislature was aware of the special provisions that it had added to the 1976 and 1981 bills, that it fully understood that the 1985 bill represented a significant enlargement of the waiver of immunity, in terms of both the kinds of actions to which the waiver would apply and the amount of damages for which the State would become liable, and that it was also aware of its direction, specified in § 12-102, that the Tort Claims Act be given a broad construction favorable to claimants. With that background, and given the fact that a waiver of immunity is more of a remedial than a substantive measure, we con-

clude that the Legislature intended the expansion to apply to actions *filed* on or after July 1, 1985, and not just to actions *accruing* after that date.[4]

In reaching this conclusion, we are not unaware of *Kee v. State Highway Admin.*, 313 Md. 445, 545 A.2d 1312 (1988). There, as here, the cause of action arose prior to July 1, 1985, but the complaint was filed after that date, and yet the Court treated the action as governed by the pre–1985 law. We observe in that regard, however, that (1) the issue presented in *Kee* was not whether the 1985 law applied to the pre–1985 claim but whether the extent of the State's insurance was to be judged as of the time the cause of action accrued, the time the action was filed, or the date a judgment was entered; and (2) neither the Court of Appeals nor this Court in its earlier consideration of *Kee*, 68 Md. App. 473, 513 A.2d 930 (1986), ruled on whether the 1985 act could or should apply.[5] We therefore do not regard *Kee* as a precedential holding on this issue.

---

4. To a large extent, the Maryland Tort Claims Act was patterned after the Federal Tort Claims Act. It is therefore interesting to note that in both the initial enactment of that law and in subsequent expansions of it, Congress was careful, as the General Assembly had been in 1976 and 1981, to make clear that the statutes applied only to claims "accruing" or "arising" on or after the respective effective dates. *See, for example,* 60 Stat. 843; 80 Stat. 306, § 10; 88 Stat. 50, § 2; 95 Stat. 1666, § 4.

5. The Court of Appeals observed in its Opinion, 313 Md. at 461, that "[f]rom and after the time the amended complaint was filed, the plaintiffs have consistently argued in the circuit court and in this Court that their action was authorized by paragraphs (3) and (4) of § 5–403(a)," those, of course, being parts of the pre–1985 law.

In our Opinion, 68 Md.App. at 487–88, 513 A.2d 930, we commented: "Appellants assert that they are not asking that the Maryland Tort Claims Act be applied retroactively, but that since the State's self-insurance program was initiated more than a month before the Treasurer decided the claim, and more than two months before the complaint was filed, there was coverage to pay a claim under the Act. They further argue that it 'makes no difference whether the coverage came into existence before or after the accident in question.' We need not address those contentions simply because whether the 1982 Act applies or the 1985 Act applies, coverage

Application of the 1985 law does clearly preclude any punitive damages against JSA; to that extent, sovereign immunity still exists. § 12–104(b).

### B. *Merits Of The Complaint—JSA*

We have already recounted some of the Circuit Court's frustration with the pleadings filed by the plaintiffs. That frustration is understandable; after five tries, the complaint remains, in many respects, fragmented, ambiguous, conclusory, imprecise, and full of gaps. It is not a model to be emulated. The question, however, is whether it is legally sufficient. The applicable standard in that regard was succinctly stated in *Lamb v. Hopkins*, 303 Md. 236, 241, 492 A.2d 1297 (1985):

> "Three basic elements are necessary to state a cause of action in negligence. First, the defendant must be under a duty to protect the plaintiff from injury. Second, the defendant must fail to discharge that duty. Third, the plaintiff must suffer actual loss or injury proximately resulting from that failure."

*See also Scott v. Watson*, 278 Md. 160, 165, 359 A.2d 548 (1976); *Peroti v. Williams*, 258 Md. 663, 669, 267 A.2d 114 (1970); *Prosser and Keeton on Torts* § 30 (5th ed. 1984).

The plaintiffs assert in Count 1 (and, through incorporation, in Counts 2 and 3 as well) that, as a condition to their participation in the foster care program, the Foors made clear to JSA that no child with a drug problem, past or present, was to be placed in their home. They also aver that JSA agreed to that condition. That, we think, suffices to charge a duty on the part of JSA to the Foors not to place such a child in their home.[6] There can be little doubt

---

remains subject 'to the extent that funds are available in the State budget....' "

6. Although the plaintiffs do not allege a breach of contract, the complaint indicates that the relationship between JSA and the Foors was contractual in nature. It has long been recognized that defective performance of a contractual undertaking may give rise to an action in tort for negligence. *See Jacques v. First Nat'l Bank*, 307 Md. 527,

that the complaint charges a breach of that duty—that, despite its agreement, JSA (1) placed Reiter in the Foor home knowing that he had a "specific history of substance abuse, including the ingestion of PCP, amphetamines, LSD, cocaine, qualudes," and marijuana, and knowing also that he had "exhibited criminal behavior which required his appearance before the Juvenile Court," and (2) concealed Reiter's drug history from the Foors.

■ Strewn among the allegations in Count 1 also appear embryonic attempts at articulating other duties and breaches as well—a failure to supervise Reiter "in a meaningful manner" or to "competently render services to Reiter" or to render "proper medical and support services pursuant to a

---

515 A.2d 756 (1986); *H & R Block v. Testerman,* 275 Md. 36, 338 A.2d 48 (1975); *Bocchini v. Gorn Management Co.,* 69 Md.App. 1, 515 A.2d 1179 (1986); *cf. Weisman v. Connors,* 312 Md. 428, 540 A.2d 783 (1988). While it is true that "[t]he mere negligent breach of a contract, absent a duty ... independent of that arising out of the contract itself, is not enough to sustain an action sounding in tort," *Heckrotte v. Riddle,* 224 Md. 591, 595, 168 A.2d 879 (1961), Maryland courts recognize that an independent duty can "arise[ ] out of the circumstances surrounding or attending the transaction." *Jacques* [307 Md.] at 534, 515 A.2d 756 (quoting *Slacum v. Trust Co.,* 163 Md. 350, 352–53, 163 A. 119 (1932)).

In determining whether a tort duty "arises out of the circumstances surrounding or attending the transaction," the nature of the harm likely to result from a failure to exercise due care must be considered, along with the nature of the relationship that exists between the parties. *Jacques* [307 Md.] at 534–37, 515 A.2d 756. Contractual privity or its equivalent is essential to the finding of a duty where the failure to use due care creates a risk of economic harm only. Where the failure to use due care creates a risk of personal injury, the requirement of contractual privity is relaxed but is replaced by a requirement that the harm have been foreseeable. The requirement of contractual privity relaxes more as the magnitude of personal injury increases. *Id.*

The failure to exercise due care in the case at bar created a risk of personal injury. As we shall see, the "general type of harm" was to some extent foreseeable. Under these circumstances, the allegations in the complaint regarding the relationship between the Foors and JSA and the agreement that no child with a drug problem would be placed in the Foor home are sufficient to allege the degree of contractual privity or its equivalent necessary for the establishment of a tort duty.

contract, with the Foors as beneficiaries of the contract." That kind of imprecise, conclusory language does not suffice to allege other, independently actionable duties. We therefore reject any assertion that the plaintiffs have adequately pled an action based on the principles enunciated in *Restatement (Second) of Torts* § 315 (1977). The only duty, and breach, adequately pled in Counts 1, 2, and 3 was to refrain from placing a child with a history of substance abuse in the Foor home.

JSA and its employees concede that the complaint adequately alleges actual injury. The issue, really, is the required nexus between the duty and breach and that injury. The connecting element, in this context, is that of foreseeability. Some courts and commentators regard foreseeability as an aspect of the "duty" that must be shown; others view it in the context of "probable cause" of the injury. In either case, it boils down to whether the harm that occurred was something that (1) the defendant could have foreseen and had a duty to protect against and (2) resulted from the defendant's breach of that duty. *See, in general, Henley v. Prince George's County,* 305 Md. 320, 333–37, 503 A.2d 1333 (1986).

JSA maintains that Anthony's murder was not a foreseeable event—that, even with the knowledge it allegedly possessed about Reiter, it had no reason to expect that he was violent or would kill anyone in the Foor home. That is *not* what the notion of foreseeability requires, however. Maryland has adopted the principle that

"Whether foreseeability is being considered from the standpoint of negligence or proximate cause, the pertinent inquiry is not whether the actual harm was of a particular kind which was expectable. Rather, the question is whether the actual harm fell within a general field of danger which should have been anticipated."

*Segerman v. Jones,* 256 Md. 109, 132, 259 A.2d 794 (1969) (quoting from *McLeod v. Grant County School Dist.,* 42 Wash.2d 316, 255 P.2d 360 (1953)); *see also Moran v.*

*Faberge,* 273 Md. 538, 551, 332 A.2d 11 (1975) and *Dalmo Sales of Wheaton v. Steinberg,* 43 Md.App. 659, 672–76, 407 A.2d 339, *cert. denied* 286 Md. 745 (1979).

In *Moran v. Faberge, supra,* the Court expounded further, quoting from Harper, *A Treatise on the Law of Torts* § 7 (1933):

> " 'the courts are perfectly accurate in declaring that there can be no liability where the harm is unforeseeable, if *"foreseeability" refers to the general type of harm sustained.* It is literally true that there is no liability for damage that falls entirely outside the *general threat of harm* which made the conduct of the actor negligent. *The sequence of events, of course, need not be foreseeable. The manner in which the risk culminates in harm may be unusual, improbable and highly unexpectable, from the point of view of the actor at the time of his conduct. And yet, if the harm suffered falls within the general danger area, there may be liability, provided other requisites of legal causation are present.' "*

(Emphasis supplied by *Moran* Court.)

Viewing the element of foreseeability in this manner, we believe that the plaintiffs have sufficiently (though barely so) alleged the required nexus. It is reasonably foreseeable that a 15–or 16–year old child, sufficiently troubled to have a history of "criminal behavior which required his appearance before the Juvenile Court," who indeed had recently been placed in detention,[7] and who has a "specific history of substance abuse, including the ingestion of PCP, amphetamines, LSD, cocaine, [and] qualudes" may continue to ingest drugs and may, as a result, become disruptive and assaultive if placed in a home without any warning to the family of the child's background and without the provision

---

7. *See* Md.Cts. & Jud.Proc.Code Ann. § 3–801(m) (defining "detention" under the Juvenile Causes Act as "the temporary care of children who, pending court disposition, *require secure custody for the protection of themselves or the community, in physically restricting facilities."* (Emphasis added.)). *See also* § 3–815 (setting forth the circumstances under which a child may be placed in detention).

of adequate follow-up support services.[8] Any reasonably sensible lay person, much less anyone purporting to have the qualifications to work in a professional capacity for the Juvenile Services Administration, could anticipate that much.

It is evident, then, that the "general type of harm" was foreseeable, even if the particular "sequence of events" was not. Accordingly, we think that an action for negligence against JSA is stated in Counts 1, 2, and 3.

### C. *Governmental Immunity—Holmes, Lochary, and Smoot*

■■ Holmes, Lochary, and Smoot are each alleged, in one fashion or another, to have been JSA employees involved with the placement or treatment of Reiter. Md. State Gov't Code Ann. § 12–105(a) provides that:

"State personnel are immune from suit in courts of the State and from liability in tort for a tortious act or omission that is within the scope of the public duties of the State personnel and is made *without malice or gross negligence,* and for which the State or its units have waived immunity under this subtitle, even if damages exceed the limits of that waiver."

(Emphasis added.)

There are three elements or conditions to this statute: (1) was the act or omission within the scope of the employee's public duties; (2) was it without malice or gross negligence; and (3) has the State waived immunity with respect to it? The first and third of these elements are clearly, in our view, satisfied. The question arises as to the second.

Nowhere in the complaint have the plaintiffs alleged any malice or anything that would constitute malice on the part

---

**8.** Although we have concluded that the amorphous averments as to JSA's failure to supervise Reiter or provide services to him or to the Foors do not suffice to state independently actionable duties, they are relevant to the extent that they add a gloss to the duty we *have* found actionable. Failure to warn or to provide services does increase the risk of harm that may arise from wrongfully placing the child in the home.

of the three employees. They do, however, in paragraph 20 of the complaint, throw in the term "gross negligence." Paragraph 20 states: "That as a result of the negligence of the Defendants, the Plaintiff was caused to suffer painful and permanent injury and was otherwise damaged and that all of his damages were as the result of the gross negligence of the Defendants without any negligence on his part contributing." That is the only place in Counts 1, 2, or 3 that the term "gross negligence" appears. It is not enough.

In *Bannon v. B. & O. R.R. Co.*, 24 Md. 108, 124 (1866), the Court observed that "[g]ross negligence is a technical term: it is the omission of that care 'which even inattentive and thoughtless men never fail to take of their own property,' it is a violation of good faith.... It implies malice and evil intention."

That standard has remained more or less intact. Gross negligence has been equated with "wilful and wanton misconduct," a "wanton or reckless disregard for human life or for the rights of others." *White v. King*, 244 Md. 348, 223 A.2d 763 (1966). In *Romanesk v. Rose*, 248 Md. 420, 423, 237 A.2d 12 (1968), the Court, quoting from 4 Blashfield, *Cyclopedia of Automobile Law and Practice* § 2771 (1946), held that "a wrongdoer is guilty of gross negligence or acts wantonly and willfully only when he inflicts injury intentionally or is so utterly indifferent to the rights of others that he acts as if such rights did not exist." *See also Liscombe v. Potomac Edison Co.*, 303 Md. 619, 495 A.2d 838 (1985). When dealing with such a standard, bald and conclusory allegations will not suffice; specificity is required. *Smith v. Gray Concrete Pipe Co.*, 267 Md. 149, 168, 297 A.2d 721 (1972); *Nast v. Lockett*, 312 Md. 343, 370, 539 A.2d 1113 (1988). That specificity is woefully lacking, and so we conclude that the three JSA employees are immune under § 12–105(a).

## II. County School Board, Foulk, and Sydnor

■ In Counts 4, 5, and 6, plaintiffs attempt to allege actions of negligence and wrongful death against the coun-

ty board of education and two of its employees. Nancy Foulk, they allege, was a "Pupil Personnel Worker" who was "familiar with REITER'S case"; James Sydnor "held himself out to the Plaintiffs as a mental health authority, a psychologist."

The precise nature of the complaint against these defendants is unfathomable. Ms. Foulk, they say, knew or should have known of Reiter's history of drug dependence and criminal behavior, although they do not state how or when she gained or should have gained such knowledge. She "coordinated a team approach to REITER'S re-entry into the school system and spent an extensive amount of time working with REITER, reviewing records, and discussing his case with other professionals," and she "attended a meeting with the Plaintiffs and professions [sic] in order to discuss REITER'S case." Sydnor "evaluated, tested, reviewed and created records pertaining to REITER for placement of REITER within the public school system"; he met with the plaintiffs and JSA representatives "to review his conclusions ... and make recommendations" and in fact "made various recommendations which led the Plaintiffs and others to take certain actions in reliance upon those recommendations." Just what recommendations Mr. Sydnor made to anyone are not revealed to us.

Upon these allegations, the plaintiffs alleged that the defendants

"owed a duty to the Plaintiffs in that they:

A. Had actual contact with the FOORS regarding REITER;

B. Gave the appearance of authority and competence upon which the FOORS could rely knowing that REITER was in capable hands and if they needed to know anything, they would have been told;

C. Should properly administer their duties with regard to the school system and servies [sic] offered."

The specific acts of negligence charged to the defendants were that they:

"A. Failed to exercise reasonable care in their dealings with REITER and his custodial parents, the FOORS;

B. [H]eld themselves out as being capable of making determinations as to REITER'S future placement in the school system and allowed the FOORS to rely on their expertise;

C. [F]ailed to recognize and/or report inherently dangerous aspects of REITER'S personality based on their records, his background and their evaluations;

D. Held themselves out as providing mental health expertise in the school system for the benefit of families; [and]

E. [F]ailed to warn the FOORS regarding REITER'S drug problem and its possible effects on him and coordinate any treatment for him."

This is so deficient as not to require discussion. There is simply no cause of action pled here.

### III. County Police Department and Guy

Just prior to oral argument, the plaintiffs dismissed their appeal as to these defendants.[9]

### IV. PCA, PCA Partners, and Bartkovich

As with their case against the public defendants, the plaintiffs attempt, in Counts 7, 8, and 9, to allege a survival action, a wrongful death action, and an action for economic

---

9. On December 22, 1988, after oral argument, the County Attorney for Baltimore County filed a motion pursuant to Maryland Rule 1–341 requesting that the Baltimore County Police Department and Thirkfield H. Guy be awarded the reasonable costs and expenses they incurred in defending the appeal. The motion points out that the police department and Guy were not dismissed from the appeal until "on or immediately before the day of oral argument" and asserts that "[i]t is obvious that [plaintiffs] never intended to pursue seriously their appeal against these [defendants] and that their refusal to dismiss the appeal as to these [defendants] until the last minute was, at the very least, without substantial justification, if not in bad faith." Attached to the motion is an affidavit of an Assistant County Attorney for Baltimore County, itemizing costs and expenses that total $694.25. Plaintiffs have not responded to the motion.

This Court has considered the motion and finds it to be meritorious. The appeal against the police department and Guy was without any

damages sustained by the Foors against PCA, its partners, and its employee Bartkovich. They contend that (1) PCA "had an obligation to provide psychological support services to JSA and the foster care program," (2) pursuant to that obligation, PCA "took over the responsibility for treatment of REITER," (3) Bartkovich was the PCA therapist "assigned to REITER'S case," and (4) Bartkovich "had a duty to provide psychological services to the FOORS and REITER as was necessary."

Upon these allegations, the plaintiffs claim that "the Defendants were grossly negligent in that they:

A. Failed to competently direct and provide for the counseling and treatment of REITER;

B. That they failed to responsib[ly] and competently communicate with the FOORS regarding REITER'S various dependencies and how to deal with them;

C. That they failed to warn the FOORS of possible dangers that they may encounter with a person who abuses controlled dangerous substances;

D. That they failed to accurately represent the nature of REITER'S difficulties;

E. That they failed to reasonably provide information to the custodial parents to allow them to cope with REITER."

Once again, we find these averments wholly inadequate. Although the complaint claims an "obligation" on the part of PCA to provide psychological services to JSA, as well as a "duty" on the part of Bartkovich to provide psychological services to the Foors and Reiter as necessary, no facts are alleged in support of that "obligation" or "duty." The plaintiffs speak of "[d]irect representations made to the Foors" and a "specific relationship that was outlined to the

---

justification whatsoever and never should have been filed. We further find the costs and expenses set forth by the County Attorney to be reasonable. *See generally Allnut v. Comptroller of the Treasury,* 77 Md.App. 424, 550 A.2d 728 (1988); *Blanton v. Equitable Bank,* 61 Md.App. 158, 161, 485 A.2d 694 (1985). They will be assessed against counsel for the plaintiffs.

Foors" but set forth no facts as to exactly what these representations were or by whom they were made. There is no allegation that Bartkovich or any other PCA defendant played any role in the placement of Reiter in the Foor home, other than that Bartkovich "encouraged [the Foors] to accept Reiter into their home."

We simply cannot conclude from the allegations before us that a sufficient nexus or a "special relationship" of any sort existed between the Foors and the PCA defendants. Even if such a relationship had been sufficiently alleged, there are no direct allegations, and no inferences can be drawn, that Bartkovich or the other PCA defendants should have foreseen the general type of harm that occurred. There are allegations that Bartkovich "knew or should have known of Reiter's substance abuse problem" and that she "knew or should have known that Reiter was a danger to both himself and others," but there are no allegations that she was, or should have been, aware that the Foors (1) did not want a foster child with a history of drug abuse, (2) did not know that Reiter had a history of drug abuse, or (3) did not know how to deal with a child with a history of drug abuse. Moreover, there is no allegation that Bartkovich knew or should have known that Reiter had a history of criminal behavior, much less the nature of that behavior.

Because the plaintiffs failed to allege facts that would give rise to a tort duty, counts 7 through 9, as well as any claims asserted against Bartkovich in Counts 1, 2, and 3, must fail.

### V. Intentional Infliction Of Emotional Distress

■ In Count 10, the Foors accuse all defendants of intentionally inflicting emotional distress upon them. Once again, however, the pleading is grossly deficient.

■ The tort at issue has four elements: "(1) The conduct must be intentional or reckless; (2) The conduct must be extreme and outrageous; (3) There must be a causal connection between the wrongful conduct and the emotional distress; (4) The emotional distress must be severe." *Harris v. Jones,* 281 Md. 560, 566, 380 A.2d 611 (1977); *see also*

*B.N. v. K.K.*, 312 Md. 135, 144, 538 A.2d 1175 (1988). Each of these elements must be pled and proved with specificity. It is not enough for a plaintiff merely to allege that they exist; he must set forth facts that, if true, would suffice to demonstrate that they exist. *See, for example, Gallagher v. Bituminous Fire & Mar. Ins.*, 303 Md. 201, 211–12, 492 A.2d 1280 (1985); *Beye v. Bureau of National Affairs*, 59 Md.App. 642, 655–56, 477 A.2d 1197, *cert. denied* 301 Md. 639, 484 A.2d 274 (1984).

The most glaring deficiencies are with the first and second elements, but, as a deficiency in any one is fatal, we need address only the first.

 To meet the "intentional or reckless" criterion of the first element, the plaintiff must allege and prove that the defendant either *desired* to inflict severe emotional distress, *knew* that such distress was *certain or substantially certain* to result from his conduct, or acted recklessly in deliberate disregard *of a high degree of probability* that the emotional distress will follow. *See Harris v. Jones, supra,* 281 Md. at 566–67, 380 A.2d 611; *Vance v. Vance,* 286 Md. 490, 505–06, 408 A.2d 728 (1979). The Foors charge generally that the conduct of the defendants was "intentional and/or negligent and constituted extremely outrageous conduct and [was] done intentionally and recklessly by Defendants without regard to the consequences to the Plaintiffs." But they set forth no facts supporting any such animus. There is no suggestion that any of the defendants acted out of a desire to inflict distress upon the Foors, or that they *knew* that such distress was substantially certain to result, or that they knew and acted in deliberate disregard of their knowledge that there was a high degree of probability that such distress would follow. Although for purposes of a negligence action, foreseeability need extend only to a general range of harm, to establish this intentional tort, the foreseeable consequence must be far more precise, for it is the achievement of that consequence, from which the distress is expected to arise, that lies at the heart of the tort.

*Conclusion*

For the reasons discussed above, we believe that the court erred in dismissing the actions pled in Counts 1, 2, and 3 against JSA, although the extent of any recovery against that agency may be limited by various provisions in the Tort Claims Act. Those counts will be remanded for further proceedings. We find no error, however, in the dismissal of all other claims against all other defendants. We find it particularly distressing that, after five opportunities, counsel have been unable to set forth a clear statement of the facts and theories upon which their clients' actions are based.

JUDGMENTS AFFIRMED IN PART AND REVERSED IN PART; CASE REMANDED TO CIRCUIT COURT FOR BALTIMORE COUNTY FOR FURTHER PROCEEDINGS ON COUNTS 1, 2, AND 3 OF THIRD AMENDED COMPLAINT, AS AMENDED; COSTS AND EXPENSES OF BALTIMORE COUNTY POLICE DEPARTMENT AND THIRKFIELD H. GUY IN THE AMOUNT OF $694.25 ASSESSED AGAINST COUNSEL FOR APPELLANT IN ACCORDANCE WITH THIS OPINION; REMAINING COSTS TO BE PAID TWO-THIRDS BY APPELLANTS, ONE-THIRD BY JUVENILE SERVICES ADMINISTRATION.