Laura **STONE–PIGOTT, et al., Phyllis J. Phillips, et al., Joan Labow, et al., Kathryn A. Bond, Patricia A. Pasternak, et al., Vicki L. Hughes, Bonnie Georgia, et al., Roberta Degennaro, et al., Plaintiffs,**

v.

**G.D. SEARLE & CO., Defendant.**

Civ. Nos. Y–83–3215, Y–84–1254, Y–84–3768, Y–85–1353, Y–85–1714, Y–85–1763, Y–85–1887 and Y–85–4034.

United States District Court, D. Maryland.

May 18, 1987.

H. Robert Erwin, Jr., Baltimore, Md., for plaintiffs.

James L. Shea and Paul F. Strain, Baltimore, Md., for defendant.

## MEMORANDUM

JOSEPH H. YOUNG, District Judge.

Plaintiffs in these products liability cases allege injuries resulting from the use of the Copper–7 intrauterine device (IUD) manufactured by defendant G.D. Searle & Co. Searle has moved for summary judgment, contending that the plaintiffs' claims are barred by the applicable statutes of limitations.

## APPLICABLE LAW

█ Consistent with this Court's analysis in *Marder v. G.D. Searle & Co.*,[1] Maryland law will be applied in these cases and the statutes of limitations are those Maryland law provides: Three years for plaintiffs' negligence, strict liability, and loss of consortium claims, and four years from delivery for plaintiffs' breach of warranty claims. Maryland law also provides a "discovery rule," which is relevant in determining when the plaintiffs' causes of action accrued.

The Maryland discovery rule delays the accrual of certain causes of action until the claimant in fact knew or reasonably should have known of the alleged wrongs. Under the rule, the court determines when a cause of action accrued and thus when the statute of limitations began to run. *Perlov v. G.D. Searle Co.*, 621 F.Supp. 1146, 1147

(D.Md.1985); *Wagner v. Allied Chemical Corp.*, 623 F.Supp. 1407, 1409 (D.Md.1985). This determination may turn on the plaintiff's actual knowledge that she has a cause of action, or on her knowledge of circumstances that would prompt a person of ordinary prudence to inquire and investigate whether she has a cause of action. In the latter case, the plaintiff is charged with implied knowledge of the facts that such an investigation would have disclosed. *Poffenberger v. Risser*, 290 Md. 631, 637, 431 A.2d 677 (1981).

In *Perlov*, this Court considered similar summary judgment motions in a group of consolidated Cu–7 cases. The Court cited with approval the decisions by courts of this district in *Rockstroh v. A.H. Robins*, 602 F.Supp. 1259, (D.Md.1985) (Miller, J.) and *Amsler v. A.H. Robins*, B–82–3295 (D.Md., Oct. 19, 1984) (Black, J.) From these IUD cases has emerged the principle that knowledge of causation—that is, knowledge that a particular injury may have been caused by an IUD—may not be sufficient to start the statute of limitations running. In addition to knowledge of causation, a plaintiff must have some indication of wrongdoing before a cause of action can be said to have accrued. This Court concluded in *Perlov* that "[i]n the absence of some indication that there was wrongdoing, a prudent person may not find it reasonable to aggressively inquire about possible product defects." 621 F.Supp. at 1148.

█ Thus, in determining when a particular plaintiff's cause of action accrued, this Court must look for knowledge of causation and for some indication of wrongdoing that would prompt a prudent person to investigate her rights. Once a plaintiff knows or suspects both causation and wrongdoing, her cause of action has ac-

1. In *Marder,* this Court applied Maryland law to several consolidated Cu–7 cases. That decision turned on an analysis of three factors: the plaintiffs' choice of Maryland as a forum; the fact that a significant proportion of the consolidated plaintiffs were Maryland residents; and the presence of the defendant, Searle, in Maryland. *Marder et al. v. G.D. Searle & Co.,* No. Y–82–3506 and related cases (D.Md. May 1,

1986), *aff'd sub nom. Wheelahan v. G.D. Searle & Co.,* 814 F.2d 655 (4th Cir.1987). A similar analysis of this case demonstrates that it is appropriate to apply Maryland law here. Again, the plaintiffs chose Maryland as a forum; no significant proportion of the plaintiffs reside in any other single state; and the defendant remains present in Maryland.

crued and the statute of limitations begins to run.

It is not easy to determine precisely what problems or symptoms constitute an indication of wrongdoing. No uniform standard can be set, because each case is different and must be analyzed individually. However, the fact that a decision is difficult cannot deter courts from it attempting to make it. Having set out principles for analyzing when a cause of action accrued, this Court must apply them as evenhandedly as possible.

## ANALYSIS

### Stone-Pigott

■ Laura Stone-Pigott used two different Cu–7s; one was inserted in January 1974 and one was inserted in January 1975. When she had difficulty conceiving in 1979, she consulted physicians and underwent two laparoscopies. Her first laparoscopy, performed by a Dr. Alberts, resulted in a diagnosis of polycystic ovarian disease and adhesions on her fallopian tubes and ovaries. The second laparoscopy was performed by a Dr. Durphy in August 1980. He told Stone-Pigott on September 10, 1980 that she had pelvic inflammatory disease (PID) and adhesions and consequently could not conceive. He also told her these problems were common among women who had used IUDs. Stone-Pigott Deposition at 126, 163.

■ Clearly, Stone-Pigott's cause of action accrued on September 10, 1980. Her suit was filed September 9, 1983, just within the three-year Maryland statute of limitations.[2]

### Phillips

■ Phyllis J. Phillips used a Dalkon Shield from September 1973 to July 1974 and a Cu–7 from September to November 1974. She testified that she believed while she was using the Cu–7 in 1974 that it was causing cramps, bleeding, and abdominal discomfort and that she felt the Cu–7 was responsible for these problems. Phillips Deposition at 70. In 1978, she suspected that adhesions and scar tissue discovered during a laparoscopy were related to her IUD use. Phillips Deposition at 137–138.

The cramps, bleeding, and discomfort Phillips experienced in 1974 did not necessarily alert her to the possibility of negligence or wrongdoing in connection with her Cu–7; some unpleasant side effects are to be expected. However, the diagnosis of adhesions and scar tissue that she linked to her IUD use in 1978 should have put her on notice of her cause of action against Searle. Because she did not file her suit until 1984, more than five years later, her claim is barred.

### Labow

■ Joan Labow used a Dalkon Shield from 1971–72 and a Cu–7 from October 1975 to September 1978. Soon after her Cu–7 was removed, she suffered an ectopic pregnancy which resulted in the removal of her left fallopian tube and ovary. Immediately afterward she discussed the ectopic pregnancy with her doctors and concluded that because she had become pregnant while the Cu–7 was in place, it must have caused her ectopic pregnancy. Labow Deposition at 113–116. This knowledge that the IUD might have caused her ectopic pregnancy and the resulting loss of a fallopian tube and ovary should have indicated the possibility of an actionable Cu–7 injury, and her cause of action accrued in 1978. However, she did not file her suit until 1984, and her claim is barred.

### Bond

■ Kathryn Bond used a Cu–7 from February 1979 to March 1982. At the time

---

**2.** Defendants have asserted that Oregon's eight-year statute of repose and two-year statute of limitations should apply to plaintiff Stone–Pigott. The Oregon statute of repose has been characterized as substantive and applied in this district. *Pottratz v. Davis,* 588 F.Supp. 949, 952–955 (D.Md. 1984) (Northrop, J.) However, that decision distinguished the substantive statute of repose, which runs from the date on which a product was purchased, from a procedural statute of limitations, which runs from the accrual of the cause of action. Drawing the same distinction here, this Court applies Maryland's three-year statute of limitations. This ruling is consistent with *Pottratz* and serves the objectives of simplicity and uniformity that compelled this Court to apply Maryland law in these Cu–7 cases.

her Cu–7 was inserted, she testified, she was told there was a small chance of infection from the IUD. Bond Deposition at 94. On March 23, 1982 she was diagnosed as having an infection "that would never go away." Bond's doctor recommended, but apparently did not perform, a hysterectomy. He told her at that time that the Cu–7 was responsible for her infection. Bond deposition at 125.

In light of the warning she had previously received, a diagnosis of severe, chronic infection should have given Bond an indication of wrongdoing. Thus, her cause of action accrued on March 23, 1982, when she first learned of causation and possible wrongdoing. However, she did not file her suit until more than three years later, on March 29, 1985, and her claim is barred.

### Pasternak

■ Patricia A. Pasternak, a nurse, used a Dalkon Shield between April 1973 and November 1974, when it apparently was expelled. She had a Cu–7 inserted in January 1975, and it broke apart and was expelled within a few weeks. Pasternak testified that she found part of the Cu–7 in a bathtub while bathing, and later recalled that her doctor removed another piece of the Cu–7 during an examination. A doctor whom she visited shortly thereafter told her she was "very sick," apparently with a pelvic infection; that she should never have another IUD inserted; and that IUDs were "horrible." The doctor wanted to hospitalize Pasternak, but she apparently did not have adequate health insurance. Pasternak Deposition at 127.

There is no dispute that Pasternak suspected in 1975 that the use of IUDs had caused her discomfort and infection. Pasternak Deposition at 50. Certainly, her doctor's admonition that IUDs were "horrible" and his diagnosis of an infection sufficiently severe to warrant hospitalization should have served as an indication of wrongdoing. However, Pasternak did not file her suit until 1985, ten years after she acquired this knowledge. Therefore, her claim is barred.

### Hughes

■ Vicki H. Hughes wore a Dalkon Shield from January to May 1974, a Cu–7 from 1975 to 1976, and another Cu–7 from 1977 to 1978. Her Dalkon Shield was removed after she complained of abdominal pain. Hughes Deposition at 107, 168. While her second Cu–7 was in place she experienced cramping and bleeding, which she attributed to the Cu–7. Hughes Deposition at 145. In 1977, she was diagnosed as having "mild endometritis," or inflammation of the mucous membrane that lines the uterus, caused by her IUD. Hughes Deposition Exhibit No. 7. However, she testified that she did not think that the problems she experienced, although caused by the Cu–7, were the result of any defect. Hughes Deposition at 168–171. These problems—endometritis, pain during intercourse, abdominal pain, bleeding and cramps—were not so severe that Hughes should have been expected to infer that her IUD was defective. They are different from the severe infections and adhesions experience by other plaintiffs, and they did not result in surgery. This Court finds that Hughes' cause of action did not accrue until November 1984, when she learned from a new doctor about problems linked to IUDs. Her suit was filed timely in December 1984.

### Georgia

■ Bonnie Georgia used a Dalkon Shield in 1973. In 1974, she read or heard something about IUDs and was sufficiently concerned to telephone her doctor, who reassured her and noted in her file that she was "worried about IUD scare." In 1976, she had a Cu–7 inserted. Apparently during the time she used the Cu–7 she experienced increased menstrual flow, vaginal discharge, discomfort and malaise. She testified that she asked her doctor whether the IUD could be causing her problems and said he did not think so. Georgia Deposition at 156. Nevertheless, she apparently had her IUD removed. Her symptoms persisted, however, and she underwent a laparoscopy in September 1979. It disclosed that she had abscesses of her fallopian tubes and ovaries, and they were removed.

When her abdominal pain persisted, she underwent a total hysterectomy in June 1980.

Georgia testified that she did not suspect a connection between these problems and her past IUD use until 1984, when she saw an article that referred to ongoing Dalkon Shield litigation. This is not implausible, because her problems prior to IUD removal were relatively mild. At that time, she was advised by her physician that her problems were not due to the Cu–7. Her problems later became severe and required radical surgery, but by then she had not used an IUD for at least a year and would not necessarily have assumed that her continuing problems were related to past IUD use. Because her cause of action did not accrue until she first learned of possible IUD defects in 1984, and she filed suit in 1985, her claim is not barred.

*Degennaro*

 Roberta DeGennaro first used a Cu–7 from 1974 to 1976. She testified that at the time the first Cu–7 was inserted, she was told that there was a slight risk of infection. She experienced no problems with the Cu–7, and it was removed in 1976. Thereafter she had a child. In 1978 she had a second Cu–7 inserted, and again experienced no ill effects until October 1981, when she was admitted to a hospital with acute abdominal pain. She was then diagnosed as having PID, the Cu–7 was removed, and she was treated with antibiotics and released. She was readmitted two days later for more treatment and remained hospitalized for another week. At that time, one of her doctors told her the IUD had caused her infection. DeGennaro deposition at 116–118. She testified that she concluded that the Cu–7 had been related to her "horrible infection" and that she would not use an IUD again. On September 28, 1982, another doctor told her that her PID was caused by the Cu–7. DeGennaro Deposition at 138–139.

DeGennaro knew in 1981 that her IUD had caused a severe PID infection which required her to be hospitalized twice for a total of more than ten days. Again, in 1982, she was told that this infection had been caused by her IUD, yet she did not file her suit until more than three years later. Her cause of action accrued in 1981 and is barred by the three-year statute of limitations.

CONCLUSION

The claims for negligence, strict liability, and loss of consortium brought by plaintiffs Stone-Pigott, Hughes, and Georgia were filed timely. However, the similar claims filed by plaintiffs Phillips, Labow, Bond, Pasternak, and DeGennaro were filed more than three years after they accrued and are therefore barred by the statute of limitations. Accordingly, defendant's motions for summary judgment on those claims will be granted as to those plaintiffs. Furthermore, because all of the plaintiffs filed more than four years after delivery of their IUDs, defendant's motions for summary judgment on those claims also will be granted.