The SOUTHLAND CORPORATION, et al.

v.

The MARLEY COMPANY

v.

RB & W CORP.

Civ. No. L–91–339.

United States District Court, D. Maryland.

March 1, 1993.

John E. Griffith, Jr., John A. Singer, and William Single, IV, Baltimore, MD, for plaintiff.

Shook, Hardy & Bacon, John F. Murphy, and Robert T. Adams, Kansas City, MO, and

Sidney G. Leech and Andrew Gendron, Baltimore, MD, for defendant and third-party plaintiff.

James R. Chason, Philip B. Barnes, and Karl Joseph Nelson, Baltimore, MD, for third-party defendant.

## MEMORANDUM

LEGG, District Judge.

In this products liability action, the Court is called upon to decide the following motions:

(i) for partial summary judgment filed by plaintiffs Southland Corporation and Ewing Oil Company ("Southland");

(ii) for partial summary judgment filed by defendant The Marley Company ("Marley"); and

(iii) for summary judgment filed by third-party defendant RB&W Corporation ("RB&W").

The instant action arises under 28 U.S.C. § 1332 (diversity of citizenship). For the reasons set forth below, the Court will, by separate order, GRANT Southland's motion IN PART. The Court will also GRANT RB & W's motion and DENY Marley's motion.

## I. FACTS

In 1986, Marley began production of piston leak detectors ("PLDs"), which are specialized instruments used to detect oil leaks in the petroleum piping that links underground tanks and above-ground gasoline dispensers.[1] Each PLD is covered by a cap secured by six "cap screws".[2] Marley purchased the cap screws from RB & W Corporation, after discussions with RB & W concerning the type of screw that would be most appropriate for incorporation into a PLD.[3]

By 1988, Marley had sold almost 100,000 PLDs for use in gas stations in the United States and Canada. Three of these stations were at "7–11" stores (owned by Southland) located in Hagerstown, Maryland, Havre de Grace, Maryland, and Gloucester, Virginia.

In December 1988, Marley learned that a PLD in Canada had failed because its cap screws had broken, resulting in an oil leak of about 1,000 gallons.[4] After obtaining the broken PLD, Marley sent it for metallurgical testing to an outside consultant, Weldon Laboratories ("Weldon").[5] On February 18, 1989, Weldon issued a report in which it identified the cause of the broken screws as hydrogen imbrittlement.[6]

Dissatisfied with the methodology behind, and conclusion of, the Weldon Report, Marley engineers began research into the possible cause of the failed screws. In late February and mid-March of 1989, Marley learned that two other PLDs had failed, one of which had resulted in a 1,000 gallon oil leak.[7] Sometime in late February or early March, Marley began conducting weekly "cap screw meetings" to discuss the problem.

In April 1989, Marley learned of three additional PLD failures caused by broken cap screws, each of which resulted in a significant oil leak.[8] In mid-April, Marley began using new, military-strength cap screws in its PLD's, and contacted RB & W to notify it that Marley believed the old cap screws were defective. Marley also sent a number of failed cap screws to an outside consultant, Quad City Metallurgical Laboratories ("Quad

---

1. Complaint ¶ 8.

2. Complaint ¶ 9.

3. Marley contends that it relied on RB & W's expertise in selecting the appropriate screws for its PLDs. In contrast, RB & W asserts that it manufactured the screws in accordance with specifications provided to it by Marley.

4. Plaintiffs' exhibit Q.

5. Marley did not have the facilities to conduct metallurgical testing in-house.

6. Plaintiffs' exhibit J. The report noted that "[h]ydrogen imbrittlement has recently made a strong come back after being virtually eliminated in the 50's and 60's. The imbrittlement is the result of not permitting the hydrogen to diffuse ... after the plating or galvanizing operation."

7. Plaintiffs' exhibit Q.

8. Plaintiffs' exhibit Q.

City"), for metallurgical testing.[9] In addition, Marley conducted a field survey across the United States to determine the extent of cap screw failure in its PLDs.

By early May 1989, Marley had received (i) Quad City's report, which confirmed the findings made by Weldon Labs[10] and (ii) the results of the field survey, which revealed that 6.7% of its PLDs in the field had broken cap screws and at least 40 had failed.[11] On May 17 and May 23, PLDs at "7–11" stations in Hagerstown and Havre de Grace Maryland failed, resulting in significant oil leaks.

On May 30, Marley issued an Urgent Notice to its customers with respect to the PLDs.[12] Following receipt of the notice, Southland conducted a field survey of its PLDs and, on June 1, discovered a third failed PLD at Gloucester, Virginia. On February 6, 1991, Southland filed the instant products liability action against Marley, alleging: (i) negligence; (ii and iii) breach of the implied warranties of merchantability and fitness for a particular purpose; (iv) strict liability; and (v) gross negligence and failure to warn. Marley seeks compensatory damages in counts i–iv of the complaint, and both compensatory and punitive damages in count v.

On March 21, 1991, Marley filed a third-party complaint against RB & W alleging: (i) negligence; (ii and iii) breach of the implied warranties of merchantability and fitness for a particular purpose; (iv) strict liability; (v) breach of express warranty; and (vi) breach of contract. Southland now moves for summary judgment with respect to count iv of its complaint against Marley (strict liability). Marley moves for summary judgment on the issue of punitive damages, and RB & W moves for summary judgment with respect to all counts of Marley's third-party complaint.

## II. DISCUSSION

### A. CHOICE OF LAW

■ Because this is a diversity action, the Court must apply Maryland's choice of law

provisions. *Erie R.R. v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938). "In tort actions, Maryland applies the doctrine of *lex loci delicti,* which provides that the substantive law of the state where the wrong occurs governs." *Rockstroh v. A.H. Robins Co., Inc.,* 602 F.Supp. 1259, 1262 (D.Md. 1985). The choice of law issue in this action is significant, because Virginia, unlike Maryland, does not recognize strict liability in products liability actions. *Lust v. Clark Equipment Co., Inc.,* 792 F.2d 436, 439 (4th Cir.1986). Both Marley and Southland contend that Maryland law governs each of the three oil leaks that form the subject matter of this suit; RB & W contends that Virginia law governs the spill which took place in Virginia.

In *Stone–Pigott v. G.D. Searle & Co.,* 660 F.Supp. 366 (D.Md.1987), this Court departed from the general rule of *lex loci delicti,* and applied Maryland tort law to a group of consolidated tort cases. The Court reasoned that "the plaintiffs chose Maryland as a forum; no significant proportion of the plaintiffs reside in any other single state; and the defendant remains present in Maryland." *Id.* at 368 n. 1. *Stone–Pigott* is distinguishable from the instant action, however, because it involved a mass tort affecting a large number of plaintiffs, rather than property damage at three discrete locations. As a result, this Court will follow the traditional doctrine of *lex loci delicti,* and apply Maryland law to the two Maryland sites, while applying Virginia law to the Gloucester leak.

### B. STANDARDS FOR SUMMARY JUDGMENT

■ Under Fed.R.Civ.P. 56(c), summary judgment is appropriate if the moving party or parties can show that "there is no genuine issue of material fact" and that they are "entitled to judgment as a matter of law." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23,

---

9. Paul Apprill Dep. at 275.

10. Plaintiffs' exhibit R.

11. Marley motion for partial summary judgment exhibit 20.

12. Marley motion for partial summary judgment exhibit 2.

106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986). The moving party or parties bear the initial burden of proof, and the Court must determine whether, viewing the evidence in the light most favorable to the non-movant, "a fair-minded jury could return a verdict for the non-movant." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 252, 106 S.Ct. 2505, 2512, 91 L.Ed.2d 202 (1986). If the movant or movants make this preliminary showing, the burden shifts to the opposing party or parties to delineate, with supporting admissible evidence, an issue of material fact. A "mere scintilla of evidence in support of the [non-movant's] position" shall not suffice. *Anderson,* 477 U.S. at 252, 106 S.Ct. at 2512.

## C. MARLEY'S MOTION

In count v of the complaint, plaintiffs allege that Marley was grossly negligent in waiting until May 30, 1989 to warn consumers of the defect in its product. In the alternative, plaintiffs allege that Marley had actual knowledge of the defect in its product prior to May 30, 1989, and intentionally withheld this information from the public. Plaintiffs seek compensatory damages under their gross negligence theory and punitive damages under their intentional failure-to-warn theory.

Marley contends that there is no evidence in the record tending to show that it was grossly negligent, or that it intentionally failed to warn the public of a known defect in its product. Plaintiffs respond that the record is replete with evidence of Marley's knowledge of the problem and its refusal to warn the public.

### 1. *Failure to Warn*

■ The failure to warn issue is governed by the recent Maryland Court of Appeals decision, *Owens–Illinois v. Zenobia,* 325 Md. 420, 601 A.2d 633 (1992).[13] In *Zenobia,* the Court of Appeals found that a manufacturer will be held strictly liable for failure to warn of a defect in its product if it "has 'knowledge, or by the application of reasonable,

developed human skill or foresight should have knowledge of the presence of the danger.'" *Id.* at 437, 601 A.2d 633 (quoting Restatement (Second) of Torts § 402A, comment j. (1965)). The Court noted that the manufacturer is "held to the knowledge of an expert in the field." *Id.* The Court also emphasized that "if a manufacturer discovers a product defect after the time of sale, the manufacturer must make reasonable efforts to issue a post-sale warning." *Id.* at 447, 601 A.2d 633. Thus, a manufacturer may be held liable for compensatory damages if it has actual or constructive knowledge of a defect, or if it should have known of the defect, and then fails to warn the public of the potential danger.

■ In order to be liable for *punitive* damages under a failure to warn theory, however, a plaintiff must establish by clear and convincing evidence that the manufacturer "*actually* knew of the defect and of the danger," and that "armed with this actual knowledge, the defendant consciously or deliberately disregarded the potential harm to consumers." *Id.* at 462–63, 464, 601 A.2d 633 (emphasis in text). The Court noted that actual knowledge includes "the wilful refusal to know," defined as "believ[ing] that it is probable that something is a fact, but deliberately shut[ting] [one's] eyes ... to avoid learning the truth." *Id.* at 462 n. 23, 601 A.2d 633 (quoting *State v. McCallum,* 321 Md. 451, 458–61, 583 A.2d 250 (1991) (Chasanow, J., concurring.)) Thus, Marley can be held liable for punitive damages only if it deliberately hid from its customers its knowledge of the defect and its danger.

■ Based on a review of the record, the Court must deny Marley's motion to preclude the jury from considering the issue of punitive damages with respect to plaintiffs' "failure to warn" claim. Plaintiffs have produced substantial evidence indicating that, long before the date on which Marley issued its "Urgent Notice", it had actual knowledge of

13. Although *Zenobia* involved personal injury rather than property damage, the Court finds nothing in *Zenobia* that indicates that the Court of Appeals intended to limit its decision to the personal injury context.

a defect in its PLDs and their potential to cause serious harm [14].

This evidence includes, but is not limited to, the following: (i) the February 18, 1989 Weldon report which concluded that the cause of the first PLD's failure was hydrogen imbrittlement [15]; (ii) reports of failures of PLD's on 12/20/88, 2/24/89, 3/17/89, 4/10/89, 4/11/89, 4/18/89, 5/10/89, and 5/11/89, with resulting environmental damage, due to broken cap screws [16]; (iii) notes taken at an internal Marley meeting on April 14, 1989, which reveal that Marley intended to discontinue use of the cap screws in question, but had decided for the time being against informing the public of any danger or instituting a retrofit program [17]; (iv) notes from an internal Marley meeting dated April 18, 1989, which reveal that Marley was aware of "multiple screw failures" and that "liability per incident" was "potentially high" [18]; (v) testimony concerning a May 10, 1989 meeting between Marley representatives and RB & W representatives at which Marley indicated that the cause of the PLD failures was defective fasteners and blamed RB & W for the defect [19]; (vi) testimony that Marley knew in May 1989 that approximately seven percent of their PLD's suffered from broken screws [20]; (vii) testimony revealing that Marley intentionally neglected to mention the defective nature of the screws in question in its May 30, 1989 notice because it "could see the possibility of litigation resulting from [talk] about 'defective' screws" [21]; and (viii) a report dated 5/8/89 from Q.C. Metallurgical Laboratories, Inc., which confirmed that the cause of the broken screws was hydrogen imbrittlement [22]. Thus, the Court will deny Marley's motion for partial summary judgment with respect to the issue of punitive damages.

### 2. Gross Negligence

■ In order to state a claim for gross negligence, the plaintiffs must show that Marley acted with "wanton and reckless disregard for human life or for the rights of others," or "utter[ ] indifferen[ce] to the rights of others such that [it acted] as if such rights did not exist." *Foor v. Juvenile Services*, 78 Md.App. 151, 170, 552 A.2d 947 (1989). Based on the evidence described above, the Court finds that there is sufficient evidence in the record to create a genuine issue of material fact with respect to Marley's alleged gross negligence in failing to issue a timely warning to the public.

### D. RB & W's MOTION

RB & W has moved for summary judgment as to all counts of Marley's complaint, contending that: (i) Marley's assumption of

---

14. The Court reads *Zenobia* to stand for the proposition that punitive damages cannot be awarded in the failure to warn context unless the manufacturer knew both that its product was defective *and* that the defect could result in serious injury or harm. *See Zenobia* at 461–62, 601 A.2d 633. The *Zenobia* standard is met in this case because the potential for harm resulting from failing PLDs was great, as Marley acknowledges. Beeson Dep. at 213–15.

15. Plaintiffs' exhibit D.

16. Plaintiffs' exhibit V. There is also testimony in the record that indicates that Marley knew of at least 34 PLD's with broken screws as of 5/11/89. Bill Mills Dep. at 193.

17. Plaintiffs' exhibit E. *See also* plaintiffs' exhibit BB (note dated 4/21/89).

18. Plaintiffs' exhibit Y.

19. Robert L. Beeson Dep. at 305, 338.

20. Mills Dep. at 210.

21. Mills Dep. at 216.

22. Plaintiffs' exhibit JJ. The Court notes, however, that the question of plaintiffs' right to have a jury consider punitive damages is a close one. The record reveals that a very small percentage of the 100,000 Marley PLDs had leaked prior to the Hagerstown incident on May 17, 1989. Most of the leaks that did occur prior to the Hagerstown leak were reported in April and May of 1989. Plaintiffs' exhibit Q. At oral argument, Marley noted that in April and May of 1989 it was trying to determine whether the PLD failures resulted from a single "bad batch" of cap screws or from an overall product defect. The record also reveals that Marley had legitimate reasons to question the accuracy of, and methodology behind, the Weldon report. *See* Apprill Dep. Finally, there is evidence in the record that Southland was aware of a possible leak at the Havre de Grace site as early as February 1989, but did nothing about the problem. Marley Opposition exhibits 2, 3.

the risk bars any recovery against RB & W; (ii) Marley's failure to provide RB & W with timely notice of the defect bars all UCC remedies; (iii) Marley has no claim based on an implied warranty theory because it provided RB & W with explicit specifications for the screws; and (iv) Marley cannot hold RB & W liable for punitive damages resulting from Marley's failure to warn the public.[23] Marley responds that: (i) there is a genuine issue of fact concerning whether it assumed the risk; (ii) the question of whether it gave timely notice to RB & W is one for the jury to resolve; and (iii) it did not waive any implied warranties. Marley concedes, however, that it cannot hold RB & W liable for any punitive damages assessed against Marley.[24]

■ The doctrine of assumption of risk prevents a plaintiff from recovering in a products liability action if the plaintiff's decision to proceed in the face of a known danger, rather than the product defect itself, constitutes the proximate cause of any resulting harm to the plaintiff. *Erdman v. Johnson Brothers*, 260 Md. 190, 205, 271 A.2d 744 (1970). In order to establish the affirmative defense of assumption of risk, RB & W must demonstrate that: (i) Marley actually knew of and appreciated the particular risk or danger created by the defect; (ii) Marley voluntarily encountered the risk while realizing the danger; and (iii) Marley's decision to encounter the known risk was unreasonable. *Ellsworth v. Sherne Lingerie, Inc.*, 303 Md. 581, 597, 495 A.2d 348 (1985).

■ Although the issue of assumption of risk is normally left to the jury because it rests upon the plaintiff's subjective knowledge, "when it is clear that a person of average intelligence in the position of the plaintiff must have understood the danger, the issue is for the court." *Schroyer v. McNeal*, 323 Md. 275, 283–84, 592 A.2d 1119 (1991). Based on the evidence discussed in section II(C) of this memorandum, the Court finds, as a matter of law, that Marley understood the danger posed by its failing PLD's [25] and assumed the risk of further harm by failing to notify the public until May 30, 1989.[26] *See United Tractor, Inc. v. Chrysler Corp.*, 563 S.W.2d 850 (Tx.Ct.App.1978) (manufacturer of defective product's action for indemnification against manufacturer of component part denied because manufacturer "discovered the defect and negligently failed to take corrective action, thus knowingly participating in the creation of the danger which caused the [resulting] harm."). Accordingly, the Court will grant RB & W's motion for summary judgment with respect to all counts of Marley's third-party complaint.[27]

23. RB & W also contends that it cannot be held strictly liable for the Gloucester spill because Virginia does not recognize strict liability. For the reasons outlined in section II(A) of this memorandum, the Court agrees, and will dismiss, by separate order, all strict liability claims relating to the Gloucester leak. *See Lust v. Clark Equipment Co., Inc.*, 792 F.2d 436, 439 (4th Cir.1986).

24. Marley opposition to RB & W motion at 44.

25. Although Marley contends that it did not know the precise cause of its failed PLDs during the period in question, there is uncontroverted evidence in the record that Marley knew that a number of its PLDs were failing, with resulting environmental contamination, in March, April, and May of 1989. For example, Marley employee Robert Beeson testified that the PLD problem was a "major, major concern" to Marley early in 1989. Beeson Dep. at 156.

Moreover, Marley does not deny that it could have easily notified its customers in early 1989 that PLDs were leaking and should be inspected for leaks on a regular basis. Such action could have prevented, or greatly mitigated the extent of, the leaks at issue in this litigation.

26. The Court's determination that Marley assumed the risk of further product failure does not in any way establish that plaintiffs are entitled to punitive damages under their failure to warn claim. The legal elements of assumption of risk and knowing failure to warn are very different. Moreover, while assumption of risk requires proof by a preponderance of the evidence, a plaintiff must prove a knowing failure to warn by clear and convincing evidence in order to be entitled to punitive damages. *See Zenobia* 325 Md. at 466–69, 601 A.2d 633.

27. Although Marley's breach of contract claim (count vi) is immune to an assumption of risk defense, the Court will grant summary judgment in RB & W's favor with respect to count vi because Marley has failed to adduce any evidence tending to show that its damages were proximately caused by RB & W's breach, rather than by its own actions. The Court will not consider the remaining arguments in RB & W's motion for summary judgment.

### E. PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT

■ Plaintiffs move for summary judgment with respect to count iv of the complaint (strict liability).[28] In order to prove strict liability in tort under Maryland law, the plaintiffs must establish that: (i) the product was in a defective condition at the time it left the seller; (ii) the product was unreasonably dangerous; (iii) the defect in the product was the cause of the injuries; and (iv) the product was expected to and did reach the consumer without substantial change in its condition. *Phipps v. General Motors Corp.*, 278 Md. 337, 363, 363 A.2d 955 (1976).

■ Marley concedes that the cap screws in its PLDS, and hence its PLDS, were defective. In its supplemental response to plaintiffs' interrogatory number nine, Marley states that "the PLD's delivered to the plaintiffs ... were not in any way defective or otherwise unsatisfactory *except for defects existing in the cap screws* ... Marley contends the cap screws provided by third-party defendant RB & W were defective."[29] Marley similarly states in its response to plaintiffs' request for admissions number 18 that "Marley admits the Cap Screws it purchased and incorporated in its PLD's were defective."[30] Thus, "it is a conclusive fact between these parties" that Marley's PLDs were defective. *Morrash v. Strobel*, 842 F.2d 64, 68 (4th Cir.1987).

With respect to the second element of strict liability, Marley does not offer any evidence to contradict the plaintiffs' evidence that the defect in the screws made the PLD's extremely dangerous and posed a great threat to the environment. Marley contends, however, that its product may have been altered or misused during installation or in the field, and that such alteration, rather than any defect in the screws, may have caused the damage at issue in this case. Marley offers no evidence, however, in support of its surmise that something other than a defect in the screws caused the oil leaks. In fact, two Marley employees assigned to investigate the cap screws, Paul Apprill and Wayne Everett Hill, testified that, in April or May 1989, they ruled out the possibility that tampering in the field was the cause of the PLDs' failure.[31]

■ Marley also contends, with supporting evidence,[32] that plaintiffs were aware of a small leak at the Hagerstown site in February 1989, but negligently failed to address the problem. The plaintiffs' alleged negligence, however, is not recognized in Maryland as a defense to a claim of strict liability. *Ellsworth v. Sherne Lingerie*, 303 Md. 581, 599, 599 n. 13, 495 A.2d 348 (1985). Thus, Marley has failed to meet its burden of coming forward with sufficient evidence to create a genuine issue of fact with respect to plaintiffs' strict liability claim. Accordingly, the Court will grant plaintiffs' motion for summary judgment with respect to its strict liability claims for the Hagerstown and Havre de Grace leaks.

### III. CONCLUSION

Thus, the Court will grant RB & W's motion for summary judgment. The Court will grant plaintiffs' motion for partial summary judgment with respect to the two Maryland leaks, and the Court will deny Marley's motion for summary judgment on the issue of punitive damages.

---

28. As noted earlier, the Court will dismiss plaintiffs' strict liability claim with respect to the Gloucester leak because Virginia does not recognize strict liability in tort.

29. Plaintiffs' exhibit K (emphasis added).

30. Plaintiffs' exhibit C.

31. Apprill Dep. at 170, 176; Hill Dep. at 300. Yet, on May 30, 1989, Marley issued a notice to its customers which stated that "it is possible that the problem is caused by improper installation, or service, or both," and which made no mention of a defect in the screws themselves. Plaintiffs' exhibit S. Marley's explanation for this is that it was "doubtful that any litigation could result from us calling the people's attention that it's possible that the problem was caused by improper installation, whereas ... [it] could see the possibility of litigation resulting from us talking about 'defective screws.'" Bill Mills Dep. at 216.

32. Marley's exhibit 3.