52 F.3d 321
NOTICE: Fourth Circuit I.O.P. 36.6 states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Fourth Circuit.
 The MARLEY COMPANY, Defendant & Third Party Plaintiff-Appellant,
and
The SOUTHLAND CORPORATION; Ewing Oil Company, Plaintiffs,
v.
RB & W CORPORATION, Third Party Defendant-Appellee.
 No. 94-1436.
 United States Court of Appeals, Fourth Circuit.
 Argued: Jan. 30, 1995.
Decided: April 26, 1995.
 
 ARGUED: Robert T. Adams, SHOOK, HARDY & BACON, P.C., Kansas City, MO, for Appellant. James Russell Chason, WHITEFORD, TAYLOR & PRESTON, Towson, Maryland, for Appellee. ON BRIEF: John F. Murphy, SHOOK, HARDY & BACON, P.C., Kansas City, MO; Sidney G. Leech, Andrew Gendron, GOODELL, DEVRIES, LEECH & GRAY, Baltimore, MD, for Appellant. Philip B. Barnes, Karl J. Nelson, WHITEFORD, TAYLOR & PRESTON, Towson, MD, for Appellee.
 Before WILKINSON, WILKINS, and LUTTIG, Circuit Judges.
 OPINION
 PER CURIAM:
 
 
 1
 Appellant The Marley Company manufactures piston leak detectors ("PLDs"), which alert gas station operators to leakage from underground fuel storage systems. RB & W Corporation, the appellee here, produces the "cap screws" that Marley uses to hold down the cover of each PLD. In late May of 1989, the Southland Corporation suffered sizeable gasoline spills at two gas stations it operated in Maryland[1] when Marley-manufactured PLDs on underground storage tanks failed due to broken cap screws. Southland filed suit against Marley, and Marley in turn filed a third-party complaint against RB & W. RB & W moved for summary judgment on the grounds that Marley assumed the risk of the Southland environmental losses by failing to timely alert purchasers to the potential for PLD failure once it learned, in early 1989, that several PLDs had failed. The district court granted RB & W's motion, ruling that, as a matter of law, "Marley understood the danger posed by its failing PLD's and assumed the risk of further harm by failing to notify the public until May 30, 1989." Southland Corp. v. Marley Co., 815 F.Supp. 881, 887 (D. Md.1993) (footnotes omitted). We conclude that the district court erred in resolving the question of assumption of risk as a matter of law, and therefore reverse.
 
 I.
 
 2
 The standards for granting summary judgment are well-established and exacting. A party is entitled to summary judgment only if it can show "that there is no genuine issue as to any material fact and that [it] is entitled to a judgment as a matter of law." Fed. R. Civ. Proc. 56(c). In reviewing a motion for summary judgment, a court must evaluate the evidence in the light most favorable to the party opposing the motion. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587-88 (1986). Summary judgment should not be granted "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). In short, when faced with a motion for summary judgment, the court must ask "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Id. at 251-52.
 
 II.
 
 3
 The evidence is not so one-sided in this case. Under Maryland law, a defendant seeking to prevail on an assumption of risk defense must demonstrate that
 
 
 4
 (1) the plaintiff actually knew of and appreciated the particular risk or danger created by the defect;
 
 
 5
 (2) the plaintiff voluntarily encountered the risk while realizing the danger; and
 
 
 6
 (3) the plaintiff's decision to encounter the known risk was unreasonable.[2]
 
 
 7
 See Ellsworth v. Sherne Lingerie, Inc., 495 A.2d 348, 356 (Md.1985); Sheehan v. Anthony Pools, Inc., 440 A.2d 1085, 1092 n. 11 (Md.App.1982). Examining the evidence in the light most favorable to Marley, we have no doubt that a reasonable jury could find that Marley's actions did not satisfy this standard.
 
 A.
 
 8
 Marley began production of the PLDs in 1986; by December 1988, it had sold between 90,000 and 100,000 PLDs for use in gas stations in the United States and Canada. Beginning in December 1988, Marley received evidence of PLD failure. Between December 20, 1988, and April 18, 1989, Marley learned of the failures of six PLDs due to problems with the cap screws. On December 20, 1988, Marley learned that a PLD in New Brunswick, Canada, had failed because its cap screws had broken. This PLD failure, as did all others to come, caused significant gasoline spillage (involving hundreds, or even thousands, of gallons).
 
 
 9
 Incapable of performing a thorough metallurgical analysis itself, Marley sent the broken cap screws to Weldon Laboratories for examination. On February 18, 1989, Weldon issued a report which concluded, "[i]t would appear that these bolts suffered from hydrogen imbrittlement." J.A. at 198. Dissatisfied with the methodology and conclusion of the Weldon report, Marley's own engineers began to examine possible causes for the cap screw failure.
 
 
 10
 In late February and mid-March of 1989, after learning that two more PLDs had failed at locations in Plant City, Florida, and in Kansas City, Missouri, Marley instituted weekly "cap screw meetings" to discuss the problem. Over a two-week span in April 1989, Marley learned of three more PLD failures--at sites in Toledo, Milwaukee, and Shell Knob, Missouri--caused by defective cap screws. Marley again sent some of the failed cap screws to an outside consultant for testing, and began its own field examinations of PLDs. The results of these tests returned by early May. The findings of the second independent report confirmed those of the first report: the caps suffered from hydrogen embrittlement. Marley's own field survey revealed that 6.7% of its PLDs in the field had broken cap screws and that at least 40 PLDs had failed.
 
 
 11
 At this point, Marley was confronted with voluminous evidence of a defect in the cap screws with potentially widespread consequences, and opted for a course of action that it had earlier rejected: it decided to retrofit all of its PLDs in the field. After spending nearly three weeks developing its retrofit campaign, Marley issued an Urgent Notice on May 30, 1989, informing its customers of the rash of cap screw and PLD failures, and urging them to replace all of the cap screws on their PLDs. Ultimately, Marley spent over $1.6 million retrofitting PLDs. Unfortunately, the Urgent Notice and the retrofit came too late for Southland, which suffered cap screw failure and resultant gasoline spills at two Maryland stations on May 17 and 23, 1989.
 
 B.
 
 12
 Based on this evidence, the district court concluded "as a matter of law, that Marley understood the danger posed by its failing PLD's and assumed the risk of further harm by failing to notify the public until May 30, 1989." Marley, 815 F.Supp. at 887. We read the evidence differently.
 
 
 13
 A defendant asserting the plaintiff's assumption of risk as a defense must first establish that the plaintiff, here Marley, actually knew of and appreciated the particular risk or danger created by the defect. The district court found this requirement satisfied because "there is uncontroverted evidence in the record that Marley knew that a number of its PLDs were failing, with resulting environmental contamination, in March, April, and May of 1989." Id. at 887 n. 25.
 
 
 14
 The court misidentified the relevant inquiry, however. Marley of course knew that its PLDs were failing in early 1989, and knew that PLD failures could result in environmental damage, but the first element of assumption of risk requires something different, namely that Marley actually know of and appreciate the particular risk or danger created by the defect. The defect in question here is not a defect in PLDs, as the district court assumed, but rather a defect in the cap screws (Marley's third-party complaint, of course, alleged that RB & W had furnished defective cap screws). Until Marley knew that the cap screws were defective, and why they were defective, it could not know of or appreciate the particular risk posed by those defects, which was the risk of widespread PLD failure and environmental damage.
 
 
 15
 Between December 1988 and late April 1989, Marley received reports of only six PLD failures, out of some 90,000-plus units in the field. Given this extremely low rate of failure, Marley could have initially viewed these as isolated and unrelated failures, due to such case-specific factors as "extreme weather conditions, isolated corrosive environments, separate or 'bad batches' of broken cap screws." Appellant's Br. at 21. Only in early May, when Marley's field research results came back, and when the second outside study confirmed the first study's finding of hydrogen embrittlement, did it become clear that the cap screws suffered from a more generalized defect. Southland's losses, of course, occurred within two weeks of this date. Because a reasonable inference from the evidence is that Marley was not aware of the particular risk or danger created by the defect in sufficient time to avert the Southland loss, the first element of the assumption of risk defense cannot be established as a matter of law.
 
 
 16
 The court also erred in finding the third element of assumption of risk--that Marley acted unreasonably in deciding to encounter the known risk--established as a matter of law. Here again it is significant that by the time Marley decided on a notice and retrofit program, it had received only six reports of cap screw-related PLD failure. Although one jury might conclude that even this small risk of failure, when coupled with the significant damages of gasoline spillage, rendered Marley's decision to encounter the risk unreasonable, another jury could reasonably find otherwise.
 
 
 17
 Moreover, the extensive investigatory measures undertaken by Marley in response to the reports of cap screw failure are hardly evidence of unreasonable behavior in the face of a known risk. With the first news of a failure, in December 1988, Marley commissioned an examination of the failed cap screws. As news of additional failures came in, it began in-house meetings, conducted its own field studies, and commissioned a second study to verify the suspect results of the first study. When, in May, the mounting evidence showed six reports of PLD failure, cap screw breakage in 6.7% of PLDs in the field, and conclusive evidence of hydrogen embrittlement as the cause of cap screw failure, Marley issued an Urgent Notice. This would undoubtedly strike many jurors as responsible business practice, not unreasonableness.
 
 
 18
 We fully recognize that a jury considering the above evidence might conclude that Marley was aware of the risk of cap screw and PLD failure, and acted unreasonably in encountering that risk. The evidence, however, is not so one-sided as to mandate those conclusions. RB & W might well be absolved of liability at trial on account of Marley's assumption of risk, but should not have been exonerated by the court.
 
 III.
 
 19
 Count five of Marley's complaint alleged that RB & W had breached its contract with Marley by "fail[ing] to provide screws made to the specifications set forth in [the contract]." J.A. at 37. The district court granted summary judgment in favor of RB & W on this count, even though assumption of risk is not a defense in this context, "because Marley has failed to adduce any evidence tending to show that its damages were proximately caused by RB & W's breach, rather than by its own actions." Marley, 815 F.Supp. at 887 n. 27. Because this ruling was undoubtedly influenced by, if not based entirely upon, the court's now-reversed ruling on assumption of risk, we also reverse the grant of summary judgment on Marley's contract claim.
 
 CONCLUSION
 
 20
 For the reasons stated herein, we reverse the district court's grant of summary judgment for RB & W, and remand for further proceedings in this case.
 
 
 21
 REVERSED AND REMANDED.
 
 
 
 [1]
 Another PLD failure at a Southland station in Virginia is not at issue in this appeal. See Southland Corp. v. Marley Co., 815 F.Supp. 881, 887 n. 23 (D. Md.1993)
 
 
 [2]
 RB & W contends that the Court of Appeals of Maryland abolished this unreasonableness requirement in Schroyer v. McNeal, 592 A.2d 1119 (Md.1991). We believe that Schroyer does not extend to products liability cases such as the present appeal, primarily because it does not mention, much less expressly overrule, any of the seminal Maryland products liability cases such as Ellsworth v. Sherne Lingerie, Inc., 495 A.2d 348 (Md.1985), and Sheehan v. Anthony Pools, Inc., 440 A.2d 1085 (Md.App.1982), which so clearly state that unreasonableness is an element of the assumption of risk defense